# APPENDIX 2

Case 1:96-cv-00484-JJF    Document 84-3    Filed 02/16/2006    Page 1 of 9




Jump to: [Opinion] [Dissent]

# SOLID WASTE AGENCY OF NORTHERN COOK COUNTY *v.* UNITED STATES ARMY CORPS OF ENGINEERS *et al.*

certiorari to the united states court of appeals for the seventh circuit

No. 99-1178. Argued October 31, 2000--Decided January 9, 2001

Petitioner, a consortium of suburban Chicago municipalities, selected as a solid waste disposal site an abandoned sand and gravel pit with excavation trenches that had evolved into permanent and seasonal ponds. Because the operation called for filling in some of the ponds, petitioner contacted federal respondents, including the Army Corps of Engineers (Corps), to determine if a landfill permit was required under §404(a) of the Clean Water Act (CWA), which authorizes the Corps to issue permits allowing the discharge of dredged or fill material into "navigable waters." The CWA defines "navigable waters" as "the waters of the United States," 33 U. S. C. §1362(7), and the Corps' regulations define such waters to include intrastate waters, "the use, degradation or destruction of which could affect interstate or foreign commerce," 33 CFR §328.3(a)(3). In 1986, the Corps attempted to clarify its jurisdiction, stating, in what has been dubbed the "Migratory Bird Rule," that §404(a) extends to intrastate waters that, *inter alia,* provide habitat for migratory birds. 51 Fed. Reg. 41217. Asserting jurisdiction over the instant site pursuant to that Rule, the Corps refused to issue a §404(a) permit. When petitioner challenged the Corps' jurisdiction and the merits of the permit denial, the District Court granted respondents summary judgment on the jurisdictional issue. The Seventh Circuit held that Congress has authority under the Commerce Clause to regulate intrastate waters and that the Migratory Bird Rule is a reasonable interpretation of the CWA.

*Held:* Title 33 CFR §328.3(a)(3), as clarified and applied to petitioner's site pursuant to the Migratory Bird Rule, exceeds the authority granted to respondents under §404(a) of the CWA. Pp. 5-14.

(a) In *United States* v. *Riverside Bayview Homes, Inc.,* 474 U. S. 121, this Court held that the Corps had §404(a) jurisdiction over wetlands adjacent to a navigable waterway, noting that the term "navigable" is of "limited import" and that Congress evidenced its intent to "regulate at least some waters that would not be deemed 'navigable' under [that term's] classical understanding," *id.,* at 133. But that holding was based in large measure upon Congress' unequivocal acquiescence to, and approval of, the Corps' regulations interpreting the CWA to cover wetlands adjacent to navigable waters. See *id.,* at 135-139. The Court expressed no opinion on the question of the Corps' authority to regulate wetlands not adjacent to open water, and the statute's text will not allow extension of the Corps' jurisdiction to such wetlands here. Pp. 5-7.

(b) The Corps' *original* interpretation of the CWA in its 1974 regulations--which emphasized that a water body's capability of use by the public for transportation or commerce determines whether it is navigable--is inconsistent with that which it espouses here, yet respondents present no persuasive evidence that the Corps mistook Congress' intent in 1974. Respondents contend that whatever its original aim, when Congress amended the CWA in 1977, it approved the more expansive definition of "navigable waters" found in the Corps' 1977 regulations. Specifically, respondents submit that Congress' failure to pass legislation that would have overturned the 1977 regulations and the extension of the Environmental Protection Agency's jurisdiction in §404(g) to include waters "other than" traditional "navigable waters" indicates that Congress recognized and accepted a broad definition of "navigable waters" that includes nonnavigable, isolated, intrastate waters. This Court recognizes congressional acquiescence to administrative interpretations of a statute with extreme care. Failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute, *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 187, because a bill can be proposed or rejected for any number of reasons. Here, respondents have failed to make the necessary showing that Congress' failure to pass legislation demonstrates acquiescence to the 1977 regulations or the 1986 Migratory Bird Rule. Section 404(g) is equally unenlightening, for it does not conclusively determine the construction to be placed on the use of the term "waters" elsewhere in the CWA. *Riverside Bayview Homes, supra,* at 138, n. 11. Pp. 7-11.

(c) Even if §404(a) were not clear, this Court would not extend deference to the Migratory Bird Rule under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837. Where an administrative interpretation of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless the construction is plainly contrary to Congress' intent. *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575. The grant of authority to Congress under the Commerce Clause, though broad, is not unlimited. See, *e.g., United States* v. *Morrison*, 529 U. S. 598. Respondents' arguments, *e.g.,* that the Migratory Bird Rule falls within Congress' power to regulate intrastate activities that substantially affect interstate commerce, raise significant constitutional questions, yet there is nothing approaching a clear statement from Congress that it intended §404(a) to reach an abandoned sand and gravel pit such as the one at issue. Permitting respondents to claim federal jurisdiction over ponds and mudflats falling within the Migratory Bird Rule would also result in a significant impingement of the States' traditional and primary power over land and water use. The Court thus reads the statute as written to avoid such significant constitutional and federalism questions and rejects the request for administrative deference. Pp. 11-14.

191 F. 3d 845, reversed.

*Rehnquist, C. J.,* delivered the opinion of the Court, in which *O'Connor, Scalia, Kennedy,* and *Thomas, JJ.,* joined. *Stevens, J.,* filed a dissenting opinion, in which *Souter, Ginsburg,* and *Breyer, JJ.,* joined.

# SOLID WASTE AGENCY OF NORTHERN COOK COUNTY, PETITIONER *v.* UNITED STATES

# ARMY CORPS OF ENGINEERS, *et al.*

### on writ of certiorari to the united states court of appeals for the seventh circuit

[January 9, 2001]

*Chief Justice Rehnquist* delivered the opinion of the Court.

Section 404(a) of the Clean Water Act (CWA or Act), 86 Stat. 884, as amended, 33 U. S. C. §1344 (a), regulates the discharge of dredged or fill material into "navigable waters." The United States Army Corps of Engineers (Corps), has interpreted §404(a) to confer federal authority over an abandoned sand and gravel pit in northern Illinois which provides habitat for migratory birds. We are asked to decide whether the provisions of §404(a) may be fairly extended to these waters, and, if so, whether Congress could exercise such authority consistent with the Commerce Clause, U. S. Const., Art. I, §8, cl. 3. We answer the first question in the negative and therefore do not reach the second.

Petitioner, the Solid Waste Agency of Northern Cook County (SWANCC), is a consortium of 23 suburban Chicago cities and villages that united in an effort to locate and develop a disposal site for baled nonhazardous solid waste. The Chicago Gravel Company informed the municipalities of the availability of a 533-acre parcel, bestriding the Illinois counties Cook and Kane, which had been the site of a sand and gravel pit mining operation for three decades up until about 1960. Long since abandoned, the old mining site eventually gave way to a successional stage forest, with its remnant excavation trenches evolving into a scattering of permanent and seasonal ponds of varying size (from under one-tenth of an acre to several acres) and depth (from several inches to several feet).

The municipalities decided to purchase the site for disposal of their baled nonhazardous solid waste. By law, SWANCC was required to file for various permits from Cook County and the State of Illinois before it could begin operation of its balefill project. In addition, because the operation called for the filling of some of the permanent and seasonal ponds, SWANCC contacted federal respondents (hereinafter respondents), including the Corps, to determine if a federal landfill permit was required under §404(a) of the CWA, 33 U. S. C. §1344(a).

Section 404(a) grants the Corps authority to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Ibid.* The term "navigable waters" is defined under the Act as "the waters of the United States, including the territorial seas." §1362(7). The Corps has issued regulations defining the term "waters of the United States" to include

> "waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce ... ." 33 CFR §328.3(a)(3) (1999).

In 1986, in an attempt to "clarify" the reach of its jurisdiction, the Corps stated that §404(a) extends to instrastate waters:

> "a. Which are or would be used as habitat by birds protected by Migratory Bird Treaties; or

"b. Which are or would be used as habitat by other migratory birds which cross state lines; or

"c. Which are or would be used as habitat for endangered species; or

"d. Used to irrigate crops sold in interstate commerce." 51 Fed. Reg. 41217.

This last promulgation has been dubbed the "Migratory Bird Rule."[1]

The Corps initially concluded that it had no jurisdiction over the site because it contained no "wetlands," or areas which support "vegetation typically adapted for life in saturated soil conditions," 33 CFR §328.3(b) (1999). However, after the Illinois Nature Preserves Commission informed the Corps that a number of migratory bird species had been observed at the site, the Corps reconsidered and ultimately asserted jurisdiction over the balefill site pursuant to subpart (b) of the "Migratory Bird Rule." The Corps found that approximately 121 bird species had been observed at the site, including several known to depend upon aquatic environments for a significant portion of their life requirements. Thus, on November 16, 1987, the Corps formally "determined that the seasonally ponded, abandoned gravel mining depressions located on the project site, while not wetlands, did qualify as 'waters of the United States' ... based upon the following criteria: (1) the proposed site had been abandoned as a gravel mining operation; (2) the water areas and spoil piles had developed a natural character; and (3) the water areas are used as habitat by migratory bird [sic] which cross state lines." U. S. Army Corps of Engineers, Chicago District, Dept. of Army Permit Evaluation and Decision Document, Lodging of Petitioner, Tab No. 1, p. 6.

During the application process, SWANCC made several proposals to mitigate the likely displacement of the migratory birds and to preserve a great blue heron rookery located on the site. Its balefill project ultimately received the necessary local and state approval. By 1993, SWANCC had received a special use planned development permit from the Cook County Board of Appeals, a landfill development permit from the Illinois Environmental Protection Agency, and approval from the Illinois Department of Conservation.

Despite SWANCC's securing the required water quality certification from the Illinois Environmental Protection Agency, the Corps refused to issue a §404(a) permit. The Corps found that SWANCC had not established that its proposal was the "least environmentally damaging, most practicable alternative" for disposal of nonhazardous solid waste; that SWANCC's failure to set aside sufficient funds to remediate leaks posed an "unacceptable risk to the public's drinking water supply"; and that the impact of the project upon area-sensitive species was "unmitigatable since a landfill surface cannot be redeveloped into a forested habitat." Id., at 87.

Petitioner filed suit under the Administrative Procedure Act, 5 U. S. C. §701 et seq., in the Northern District of Illinois challenging both the Corps' jurisdiction over the site and the merits of its denial of the §404(a) permit. The District Court granted summary judgment to respondents on the jurisdictional issue, and petitioner abandoned its challenge to the Corps' permit decision. On appeal to the Court of Appeals for the Seventh Circuit, petitioner renewed its attack on respondents' use of the "Migratory Bird Rule" to assert jurisdiction over the site. Petitioner argued that respondents had exceeded their statutory authority in interpreting the CWA to cover nonnavigable, isolated, intrastate waters based upon the presence of migratory birds and, in the alternative, that Congress lacked the power under the Commerce Clause to grant such regulatory jurisdiction.

The Court of Appeals began its analysis with the constitutional question, holding that Congress has

the authority to regulate such waters based upon "the cumulative impact doctrine, under which a single activity that itself has no discernible effect on interstate commerce may still be regulated if the aggregate effect of that class of activity has a substantial impact on interstate commerce." 191 F. 3d 845, 850 (CA7 1999). The aggregate effect of the "destruction of the natural habitat of migratory birds" on interstate commerce, the court held, was substantial because each year millions of Americans cross state lines and spend over a billion dollars to hunt and observe migratory birds.[2] *Ibid.* The Court of Appeals then turned to the regulatory question. The court held that the CWA reaches as many waters as the Commerce Clause allows and, given its earlier Commerce Clause ruling, it therefore followed that respondents' "Migratory Bird Rule" was a reasonable interpretation of the Act. See *id.*, at 851-852.

We granted certiorari, 529 U. S. 1129 (2000), and now reverse.

Congress passed the CWA for the stated purpose of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters." 33 U. S. C. §1251(a). In so doing, Congress chose to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter." §1251(b). Relevant here, §404(a) authorizes respondents to regulate the discharge of fill material into "navigable waters," 33 U. S. C. §1344(a), which the statute defines as "the waters of the United States, including the territorial seas," §1362(7). Respondents have interpreted these words to cover the abandoned gravel pit at issue here because it is used as habitat for migratory birds. We conclude that the "Migratory Bird Rule" is not fairly supported by the CWA.

This is not the first time we have been called upon to evaluate the meaning of §404(a). In *United States* v. *Riverside Bayview Homes, Inc.*, 474 U. S. 121 (1985), we held that the Corps had §404(a) jurisdiction over wetlands that actually abutted on a navigable waterway. In so doing, we noted that the term "navigable" is of "limited import" and that Congress evidenced its intent to "regulate at least some waters that would not be deemed 'navigable' under the classical understanding of that term." *Id.*, at 133. But our holding was based in large measure upon Congress' unequivocal acquiescence to, and approval of, the Corps' regulations interpreting the CWA to cover wetlands adjacent to navigable waters. See *id.*, at 135-139. We found that Congress' concern for the protection of water quality and aquatic ecosystems indicated its intent to regulate wetlands "inseparably bound up with the 'waters' of the United States." *Id.*, at 134.

It was the significant nexus between the wetlands and "navigable waters" that informed our reading of the CWA in *Riverside Bayview Homes*. Indeed, we did not "express any opinion" on the "question of the authority of the Corps to regulate discharges of fill material into wetlands that are not adjacent to bodies of open water ... ." *Id.*, at 131-132, n. 8. In order to rule for respondents here, we would have to hold that the jurisdiction of the Corps extends to ponds that are *not* adjacent to open water. But we conclude that the text of the statute will not allow this.

Indeed, the Corps' *original* interpretation of the CWA, promulgated two years after its enactment, is inconsistent with that which it espouses here. Its 1974 regulations defined §404(a)'s "navigable waters" to mean "those waters of the United States which are subject to the ebb and flow of the tide, and/or are presently, or have been in the past, or may be in the future susceptible for use for purposes of interstate or foreign commerce." 33 CFR §209.120(d)(1). The Corps emphasized that "[i]t is the water body's capability of use by the public for purposes of transportation or commerce which is the determinative factor." §209.260(e)(1). Respondents put forward no persuasive evidence that the Corps mistook Congress' intent in 1974.[3]

Respondents next contend that whatever its original aim in 1972, Congress charted a new course five years later when it approved the more expansive definition of "navigable waters" found in the Corps' 1977 regulations. In July 1977, the Corps formally adopted 33 CFR §323.2(a)(5) (1978), which defined "waters of the United States" to include "isolated wetlands and lakes, intermittent streams, prairie potholes, and other waters that are not part of a tributary system to interstate waters or to navigable waters of the United States, the degradation or destruction of which could affect interstate commerce." Respondents argue that Congress was aware of this more expansive interpretation during its 1977 amendments to the CWA. Specifically, respondents point to a failed House bill, H. R. 3199, that would have defined "navigable waters" as "all waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce." 123 Cong. Rec. 10420, 10434 (1977).[4] They also point to the passage in §404(g)(1) that authorizes a State to apply to the Environmental Protection Agency for permission "to administer its own individual and general permit program for the discharge of dredged or fill material into the navigable waters (other than those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce ... including wetlands adjacent thereto) within its jurisdiction ... ." 33 U. S. C. §1344(g)(1). The failure to pass legislation that would have overturned the Corps' 1977 regulations and the extension of jurisdiction in §404(g) to waters "other than" traditional "navigable waters," respondents submit, indicate that Congress recognized and accepted a broad definition of "navigable waters" that includes nonnavigable, isolated, intrastate waters.

Although we have recognized congressional acquiescence to administrative interpretations of a statute in some situations, we have done so with extreme care.[5] "[F]ailed legislative proposals are 'a particularly dangerous ground on which to rest an interpretation of a prior statute.' " *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.,* 511 U. S. 164, 187 (1994) (quoting *Pension Benefit Guaranty Corporation* v. *LTV Corp.,* 496 U. S. 633, 650 (1990)). A bill can be proposed for any number of reasons, and it can be rejected for just as many others. The relationship between the actions and inactions of the 95th Congress and the intent of the 92d Congress in passing §404(a) is also considerably attenuated. Because "subsequent history is less illuminating than the contemporaneous evidence," *Hagen* v. *Utah,* 510 U. S. 399, 420 (1994), respondents face a difficult task in overcoming the plain text and import of §404(a).

We conclude that respondents have failed to make the necessary showing that the failure of the 1977 House bill demonstrates Congress' acquiescence to the Corps' regulations or the "Migratory Bird Rule," which, of course, did not first appear until 1986. Although respondents cite some legislative history showing Congress' recognition of the Corps' assertion of jurisdiction over "isolated waters,"[6] as we explained in *Riverside Bayview Homes,* "[i]n both Chambers, debate on the proposals to narrow the definition of navigable waters centered largely on the issue of wetlands preservation." 474 U. S., at 136. Beyond Congress' desire to regulate wetlands adjacent to "navigable waters," respondents point us to no persuasive evidence that the House bill was proposed in response to the Corps' claim of jurisdiction over nonnavigable, isolated, intrastate waters or that its failure indicated congressional acquiescence to such jurisdiction.

Section 404(g) is equally unenlightening. In *Riverside Bayview Homes* we recognized that Congress intended the phrase "navigable waters" to include "at least some waters that would not be deemed 'navigable' under the classical understanding of that term." *Id.,* at 133. But §404(g) gives no intimation of what those waters might be; it simply refers to them as "other ... waters." Respondents conjecture that "other ... waters" must incorporate the Corps' 1977 regulations, but it is also plausible, as petitioner contends, that Congress simply wanted to include all waters adjacent to "navigable waters," such as nonnavigable tributaries and streams. The exact meaning of §404(g) is not before us and we express no

opinion on it, but for present purposes it is sufficient to say, as we did in *Riverside Bayview Homes*, that "§404(g)(1) does not conclusively determine the construction to be placed on the use of the term 'waters' elsewhere in the Act (particularly in §502(7), which contains the relevant definition of 'navigable waters') ... ." *Id.*, at 138, n. 11.[7]

We thus decline respondents' invitation to take what they see as the next ineluctable step after *Riverside Bayview Homes*: holding that isolated ponds, some only seasonal, wholly located within two Illinois counties, fall under §404(a)'s definition of "navigable waters" because they serve as habitat for migratory birds. As counsel for respondents conceded at oral argument, such a ruling would assume that "the use of the word navigable in the statute ... does not have any independent significance." Tr. of Oral Arg. 28. We cannot agree that Congress' separate definitional use of the phrase "waters of the United States" constitutes a basis for reading the term "navigable waters" out of the statute. We said in *Riverside Bayview Homes* that the word "navigable" in the statute was of "limited effect" and went on to hold that §404(a) extended to nonnavigable wetlands adjacent to open waters. But it is one thing to give a word limited effect and quite another to give it no effect whatever. The term "navigable" has at least the import of showing us what Congress had in mind as its authority for enacting the CWA: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made. See, *e.g.*, *United States v. Appalachian Elec. Power Co.*, 311 U. S. 377, 407-408 (1940).

Respondents--relying upon all of the arguments addressed above--contend that, at the very least, it must be said that Congress did not address the precise question of §404(a)'s scope with regard to nonnavigable, isolated, intrastate waters, and that, therefore, we should give deference to the "Migratory Bird Rule." See, *e.g.*, *Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). We find §404(a) to be clear, but even were we to agree with respondents, we would not extend *Chevron* deference here.

Where an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result. See *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575 (1988). This requirement stems from our prudential desire not to needlessly reach constitutional issues and our assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority. See *ibid.* This concern is heightened where the administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power. See *United States v. Bass,* 404 U. S. 336, 349 (1971) ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance"). Thus, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *DeBartolo, supra,* at 575.

Twice in the past six years we have reaffirmed the proposition that the grant of authority to Congress under the Commerce Clause, though broad, is not unlimited. See *United States v. Morrison,* 529 U. S. 598 (2000); *United States v. Lopez,* 514 U. S. 549 (1995). Respondents argue that the "Migratory Bird Rule" falls within Congress' power to regulate intrastate activities that "substantially affect" interstate commerce. They note that the protection of migratory birds is a "national interest of very nearly the first magnitude," *Missouri v. Holland,* 252 U. S. 416, 435 (1920), and that, as the Court of Appeals found, millions of people spend over a billion dollars annually on recreational pursuits relating to migratory birds. These arguments raise significant constitutional questions. For example, we would have to evaluate the precise object or activity that, in the aggregate, substantially affects interstate commerce. This is not clear, for although the Corps has claimed jurisdiction over petitioner's land because it contains water areas used as habitat by migratory birds, respondents now, *post litem motam,* focus upon

the fact that the regulated activity is petitioner's municipal landfill, which is "plainly of a commercial nature." Brief for Federal Respondents 43. But this is a far cry, indeed, from the "navigable waters" and "waters of the United States" to which the statute by its terms extends.

These are significant constitutional questions raised by respondents' application of their regulations, and yet we find nothing approaching a clear statement from Congress that it intended §404(a) to reach an abandoned sand and gravel pit such as we have here. Permitting respondents to claim federal jurisdiction over ponds and mudflats falling within the "Migratory Bird Rule" would result in a significant impingement of the States' traditional and primary power over land and water use. See, *e.g.*, *Hess* v. *Port Authority Trans-Hudson Corporation,* 513 U. S. 30, 44 (1994) ("[R]egulation of land use [is] a function traditionally performed by local governments"). Rather than expressing a desire to readjust the federal-state balance in this manner, Congress chose to "recognize, preserve, and protect the primary responsibilities and rights of States ... to plan the development and use ... of land and water resources ... ." 33 U. S. C. §1251(b). We thus read the statute as written to avoid the significant constitutional and federalism questions raised by respondents' interpretation, and therefore reject the request for administrative deference.[8]

We hold that 33 CFR §328.3(a)(3) (1999), as clarified and applied to petitioner's balefill site pursuant to the "Migratory Bird Rule," 51 Fed. Reg. 41217 (1986), exceeds the authority granted to respondents under §404(a) of the CWA. The judgment of the Court of Appeals for the Seventh Circuit is therefore

Reversed.

---

# SOLID WASTE AGENCY OF NORTHERN COOK COUNTY, PETITIONER *v.* UNITED STATES ARMY CORPS OF ENGINEERS *et al.*

on writ of certiorari to the united states court of appeals for the seventh circuit

[January 9, 2001]

---

*Justice Stevens,* with whom *Justice Souter, Justice Ginsburg,* and *Justice Breyer* join, dissenting.

In 1969, the Cuyahoga River in Cleveland, Ohio, coated with a slick of industrial waste, caught fire. Congress responded to that dramatic event, and to others like it, by enacting the Federal Water Pollution Control Act (FWPCA) Amendments of 1972, 86 Stat. 817, as amended 33 U. S. C. §1251 *et seq.*, commonly known as the Clean Water Act (Clean Water Act, CWA, or Act).[1] The Act proclaimed the ambitious goal of ending water pollution by 1985. §1251(a). The Court's past interpretations of the CWA have been fully consistent with that goal. Although Congress' vision of zero pollution remains