SUE ELLEN WOOLDRIDGE
ASSISTANT ATTORNEY GENERAL

STEVEN E. RUSK
MARY ANNE ZIVNUSKA
Trial Attorneys
United States Department of Justice
Environment & Natural Resources Division
Post Office Box 23986
Washington, DC 20026-3986
Delaware Bar I.D. No. 3144
(202) 514-9275

COLM F CONNOLLY
UNITED STATES ATTORNEY

PATRICIA C. HANNIGAN
Assistant United States Attorney
Delaware Bar I.D. No. 2145
The Nemours Building
1007 Orange Street, Suite 700
P. O. Box 2046
Wilmington, DE 19899-2046
(302) 573-6277

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Civil Action No. 96-484-JJF |
| | ) |
| Plaintiff, | ) **MEMORANDUM IN SUPPORT OF** |
| | ) **UNITED STATES' MOTION** |
| v. | ) **FOR SUMMARY JUDGMENT** |
| | ) **ON RESTORATION AND CIVIL** |
| DAVID H. DONOVAN, | ) **PENALTY AND IN OPPOSITION** |
| | ) **TO DEFENDANT'S MOTIONS** |
| Defendant. | ) **FILED ON FEBRUARY 16, 2006** |

Dated:  March 10, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

TABLE OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    Civil Penalty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.    Harm To The Environment And Community As A Result Of Defendant's
1.771 Acre Clean Water Act Violation . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.    Defendant Is Able To Pay A Significant Civil Penalty . . . . . . . . . . . . . . . . . . . 9

      A.    Real Estate Holdings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          1.    Donovan's Personal Residence . . . . . . . . . . . . . . . . . . . . . . 10

          2.    Donovan's Investment Property . . . . . . . . . . . . . . . . . . . . . . 11

          3.    Other Investment Property . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.    Hauling Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      C.    Queen Holdings, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          1.    Bank of America Account . . . . . . . . . . . . . . . . . . . . . . . . 14

          2.    Man Financial Account . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      D.    Personal Brokerage/Investment Accounts . . . . . . . . . . . . . . . . . . . 15

      E.    Cash On Hand In July 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.      THE COURT SHOULD ISSUE AN INJUNCTION THAT REQUIRES THE DEFENDANT TO RESTORE THE 1.771 ACRES OF WETLANDS HE DESTROYED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     A.      The United States' Proposed Wetland Restoration Plan Will Confer Maximum Environmental Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     B.      The Wetland Restoration Plan Is Achievable As A Practical Matter . . . 19

     C.      The Wetland Restoration Plan Bears An Equitable Relationship To The Degree And Kind Of Wrong It Is Intended To Remedy . . . . . . . . . 20

II.     THE COURT SHOULD ORDER THE DEFENDANT TO PAY A $256,000 CIVIL PENALTY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     A.      In Calculating An Appropriate Penalty, The Court Must Start With The Statutory Maximum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     B.      The Court Should Reduce The Maximum Penalty Only To The Extent Defendant Establishes The Existence Of Mitigating Factors . . . . . . . . 24

         1.      The Violations Are Serious . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

             a.      Number Of Violations . . . . . . . . . . . . . . . . . . . . . . . . . . 26

             b.      Duration And Degree Of The Violations . . . . . . . . . . . . . 26

             c.      Environmental Significance Of The Violations . . . . . . . . 26

             d.      Adverse Effect On The Public . . . . . . . . . . . . . . . . . . . . 27

         2.      The Defendant Benefitted Economically From His Violations . . 28

         3.      The Defendant Has An Egregious History Of Non-Compliance . 31

         4.      The Defendant Openly Ignored The Clean Water Act. . . . . . . . 31

         5.      The Economic Impact Of The Proposed Penalty . . . . . . . . . . . . 33

III.    THE COURT SHOULD REJECT DEFENDANT'S ATTEMPT TO RE-LITIGATE, FOR A THIRD TIME, THE ISSUE OF HIS LIABILITY UNDER THE CWA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

IV.    THE COURT SHOULD REJECT DEFENDANT'S ATTEMPT TO
       RESURRECT HIS COUNTERCLAIM AGAINST THE UNITED STATES . . 34

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## TABLE OF AUTHORITIES

**CASES:**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Atlantic States Legal Found. v. Tyson Foods, Inc., 897 F.2d 1128
    (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 22, 24

Atlantic States Legal Found. v. Universal Tool & Stamping Co.,
    786 F. Supp. 743 (N.D. Ind. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Borden Ranch P'ship v. United States Army Corps of Eng'rs, No. S97-0858,
    1999 WL 1797329 (E.D. Cal. Nov. 8, 1999), aff'd in part, rev'd in part,
    vacated in part, 261 F.3d 810 (9th Cir. 2001), aff'd, 537 U.S. 99 (2002) . . . . . . . . . . . 3

Borden Ranch P'ship v. United States Army Corps of Eng'rs,
    261 F.3d 810 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Dombrowski v. Eastland, 387 U.S. 82 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253 (1968) . . . . . . . . . . . . . . . . . . . . . . 16

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167 (2000) . . . . . . . . . 5

Hawaii's Thousand Friends v. City & County of Honolulu,
    821 F. Supp. 1368 (D. Haw. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

Informed Citizens United, Inc. v. USX Corp., 36 F. Supp. 2d 375 (S.D. Tex. 1999) . . . 23

Kelly v. EPA, 203 F.3d 519 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Leslie Salt Co. v. United States, 820 F. Supp. 478 (N.D. Cal. 1992), aff'd in part,
    55 F.3d 1388 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Leslie Salt v. United States, 55 F.3d 1388 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . 4

NRDC v. Southwest Marine, Inc., 236 F.3d 985 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . 4

NRDC v. Texaco Refining & Marketing, Inc., 800 F. Supp. 1 (D. Del. 1992),
    aff'd in part, rev'd in part, 2 F.3d 493 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . 25

PIRG v. Powell Duffryn Terminals, Inc., 720 F. Supp. 1158 (D.N.J 1989),
    aff'd in part, rev'd in part, 913 F.2d 64 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . 5, 31

Public Interest Research Group v. Powell Duffryn Terminals, Inc.,
    913 F.2d 64 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28

Sasser v. EPA, 990 F.2d 127 (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Sierra Club v. Cedar Point Oil Co., 73 F.3d 546 (5th Cir. 1996) . . . . . . . . . . . . . . . . . 22

Sierra Club v. Simkins Indus., Inc., 847 F.2d 1109 (4th Cir. 1988) . . . . . . . . . . . . . . . 5

Tull v. United States, 481 U.S. 412 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5

United States v. Bradshaw, 541 F. Supp. 884 (D. Md. 1982) . . . . . . . . . . . . . . . . . . . . 18

United States v. Ciampitti, 615 F. Supp. 116 (D.N.J. 1984), aff'd, 772 F.2d
    893 (3d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 18, 19, 21

United States v. Ciampitti, 669 F. Supp. 684 (D.N.J. 1987) . . . . . . . . . . . . . . . . . . . . . 23

United States v. Cumberland Farms of Conn., 826 F.2d 1151 (1st Cir. 1987) . . . . . . 3, 20

United States v. Cumberland Farms of Conn., 647 F. Supp. 1166
    (D. Mass 1986), aff'd, 826 F.2d 1151 (1st Cir. 1987) . . . . . . . . . . . . . . 4, 18, 19, 21, 23

United States v. Deaton, 332 F.3d 698 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 4

United States v. Donovan, Civ. No. 96-484 (D. De. Mar. 26, 2002) 1, 5, 21, 27, 32, 33, 34

United States v. Environmental Waste Control, Inc., 710 F. Supp. 1172
    (N.D. Ind. 1989), aff'd, 917 F.2d 327 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Gulf Park Water Co., 14 F. Supp. 2d 854
    (S.D. Miss. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24, 25, 28, 31

United States v. Hartz Construction Co., No. 98-C-4785, 2000 WL. 1220919
    (N.D. Ill. Aug. 18, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States v. ITT Continental Baking Co., 420 U.S. 223 (1975) . . . . . . . . . . . . . 5, 31

United States v. Key West Towers, Inc., 720 F. Supp. 963 (S.D. Fla. 1989) . . . 23, 25, 29

United States v. Municipal Auth. of Union Township,
  150 F.3d 259 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States v. Pozsgai, No. 88-6545, 1990 WL 1432 (E.D. Pa. Jan. 8, 1990) . . . . . . . 3

United States v. Pozsgai, 999 F.2d 719 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 21

United States v. Reaves, 923 F. Supp. 1530 (M.D. Fla. 1996) . . . . . . . . . . . . . . . . . . . 23

United States v. Robinson, 570 F. Supp. 1157 (M.D. Fla. 1983) . . . . . . . . . . . . . . . . . 21

United States v. Roll Coater, 21 Envtl. L. Rep. (Envtl. L. Inst.) 21073
  (S.D. Ind. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24, 25, 31

United States v. Smithfield Foods, 191 F.3d 516 (4th Cir. 1999) . . . . . . . 5, 22, 24, 29, 31

United States v. Van Leuzen, 816 F. Supp. 1171 (S.D. Tex. 1993) . . . . . . . . . . . . . 3, 21

United States v. Weisman, 489 F. Supp. 1331 (M.D. Fla.), aff'd, 632 F.2d 891
  (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**STATUTES:**

Clean Water Act, 33 U.S.C. §§ 1251 - 1387:

33 U.S.C. § 1251 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

33 U.S.C. § 1251(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

33 U.S.C. § 1311(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

33 U.S.C. § 1319(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

33 U.S.C. § 1319(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4, 22, 23, 25

33 U.S.C. § 1344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

33 U.S.C. § 1362(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**RULES:**

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**REGULATIONS:**

33 C.F.R. § 328.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

40 C.F.R. § 232.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**FEDERAL REGISTERS:**

61 Fed. Reg. 69,360 (Dec. 31, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

69 Fed. Reg. 7121 (Feb. 13, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**LEGISLATIVE MATERIALS:**

S. Rep. No. 50, 99th Cong., 1st Sess. (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## TABLE OF EXHIBITS

Letter from David H. Donovan to Mr. Cianfrani, United States
Army Corps of Engineers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 1

Deposition of David H. Donovan, July 7, 2000 . . . . . . . . . . . . . . . . . . . . . . . Exhibit 2

Declaration of Jeffrey Steen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 3

Affidavit of Joseph Gerber . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 4

Affidavit of Philip J. McGinnis   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 5

Affidavit of Gerald S. Harris . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 6

Declaration of Allison A. Berl, Custodian of Records for
Wilmington Trust Company  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 7

Declaration of Elizabeth A. Stanford, Custodian of Records for
Bank of America  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 8

Borden Ranch P'ship v. United States Army Corps of Eng'rs,
No. S97-0858, 1999 WL 1797329 (E.D. Cal. Nov. 8, 1999) . . . . . . . . . . . . . . Exhibit 9

United States v. Pozsgai, No. 88-6545, 1990 WL 1432
(E.D. Pa. Jan. 8, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 10

United States v. Roll Coater, 21 Envtl. L. Rep. (Envtl. L. Inst.)
21073, 21075 (S.D. Ind. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 11

United States v. Hartz Constr. Co., No. 98-C-4785,
2000 WL 1220919, at *2 (N.D. Ill. Aug. 18, 2000) . . . . . . . . . . . . . . . . . . . . Exhibit 12

INTRODUCTION

This is a civil enforcement action pursuant to sections 309(b) and (d) of the Clean Water Act ("CWA") for injunctive relief and civil penalties against Defendant David H. Donovan for discharging pollutants into waters of the United States without a section 404 permit. 33 U.S.C. §§ 1319(b) & (d), 1344. On November 1, 2000, the United States filed a Motion for Summary Judgment on the issue of liability and to dismiss Defendant's counter-claim [Dkt. 46 and 47]. Defendant filed a Cross-Motion for Summary Judgment on December 4, 2000 [Dkt. 50]. On March 26, 2002, the Court granted the United States' Motion for Summary Judgment, and denied Defendant's Cross-Motion. United States v. Donovan, Civ. No. 96-484, slip op. at 8 (D. Del. Mar. 26, 2002) ("[T]he Government has established by undisputed evidence that it is entitled to a judgment on the issue of liability.") [Dkt. 51]. Thus, the remedy and penalty phase for Defendant's CWA violations are all that remain in this case.

In this motion, the United States seeks an order requiring the Defendant to restore the 1.771 acres of wetlands he destroyed. This is an inherent part of the injunctive relief afforded under the CWA and is squarely within this Court's equitable jurisdiction. 33 U.S.C. § 1319(b). Restoration, a simple process in this case, is necessary because the destroyed wetlands had previously provided important natural resource functions, including water purification, storm water detention, flood attenuation, flood plain benefits, and habitat for wildlife. If restored, the 1.771 acres of wetlands would once again provide these functions.

The United States also seeks an order requiring the Defendant to pay an appropriate civil penalty, which the CWA expressly requires. Id. § 1319(d). Defendant's flagrant violations have continued for more than twelve years despite repeated efforts by the United

States Army Corps of Engineers ("Corps") to work with him to apply for and obtain a permit before the violations occurred, three federal cease and desist letters demanding that he remove the fill material that was discharged without a permit, and this Court's ruling that he violated the CWA. Rather than comply with the law, Defendant declared his land a "foreign nation" and himself immune from federal and state law, identified himself as a member of a militia group, and sent a threatening letter to the regulatory official in charge of his case. See Letter from David H. Donovan to Mr. Cianfrani, United States Army Corps of Engineers (U.S. Exhibit 1). Defendant's egregious contempt for the rule of law, together with the damage his illegal conduct continues to have on the environment and the surrounding community, warrant a strong judicial response.

Defendant has attempted to conceal his assets from the government and creditors over the years using shell companies, including an off-shore company, and a false social security number. Nevertheless, county property records and bank documents demonstrate that the Defendant has the ability to pay a civil penalty of at least $256,000. Since 1959, the Defendant has owned 20 pieces of real estate that he has transferred back and forth among shell companies. Defendant has amassed at least $490,000 in real estate, $166,302 in cash, and $5,870 in a brokerage account as of August 2005. The full extent of Defendant's wealth cannot be determined due to his substantial efforts to conceal his wealth.

## STATUTORY BACKGROUND

The CWA is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, the CWA prohibits the discharge of pollutants into navigable waters unless authorized by a CWA

permit. Id. § 1311(a). The CWA broadly defines "navigable waters" as "waters of the United States." Id. § 1362(7); 33 C.F.R. § 328.3(a) (Corps' definition of "waters of the United States"); 40 C.F.R. § 232.2 (EPA's definition of "waters of the United States"). To achieve the CWA's goals, Congress specifically authorized equitable relief and civil penalties to redress violations of the Act. 33 U.S.C. §§ 1319(b) and (d); Tull v. United States, 481 U.S. 412, 425 (1987).

A.    Injunctive Relief

Requiring a defendant to restore wetlands he illegally destroyed is an inherent part of the injunctive relief the CWA contemplates and is squarely within this Court's equitable jurisdiction. 33 U.S.C. §§ 1251(a), 1319(b); Tull, 481 U.S. at 424. "The duty to restore an intentionally filled wetland is mandatory, absent equities." United States v. Van Leuzen, 816 F. Supp. 1171, 1180 (S.D. Tex. 1993).[1] Moreover, "restoration measures favored by the [Corps] are given considerable deference because of its expertise in achieving the goals of the Clean Water Act." Borden Ranch P'ship v. United States Army Corps of Eng'rs, No. S97-0858, 1999 WL 1797329, at *21 (E.D. Cal. Nov. 8, 1999), aff'd in part, rev'd in part on other grounds, vacated in part, 261 F.3d 810 (9th Cir. 2001), aff'd, 537 U.S. 99 (2002) (U.S. Exhibit 9). "There can be no doubt that this court has the power under the Clean Water Act

---

[1] United States v. Cumberland Farms of Conn., 826 F.2d 1151, 1164 (1st Cir. 1987) (court has "authority to issue such restorative orders so as to effectuate the stated goals of the Clean Water Act 'to maintain the chemical, physical, and biological integrity of the Nation's waters.'") (quoting 33 U.S.C. § 1251); Leslie Salt Co. v. United States, 820 F. Supp. 478, 484 (N.D. Cal. 1992) (United States is entitled to "injunctive relief which restores the property at the points of violation to essentially their pre-existing condition"), aff'd in part, 55 F.3d 1388 (9th Cir. 1995); United States v. Pozsgai, No. 88-6545, 1990 WL 1432, at *2 (E.D. Pa. Jan. 8, 1990) ("United States is entitled to a permanent injunction against any further filling and to a restoration order.") (U.S. Exhibit 10).

to order the restoration proposed by the Government." United States v. Ciampitti, 615 F. Supp. 116, 122 (D.N.J. 1984), aff'd, 772 F.2d 893 (3d Cir. 1985).

In selecting an appropriate wetland restoration plan, the Court should consider whether the proposed plan: (1) will confer maximum environmental benefits; (2) is achievable as a practical matter; and (3) bears an equitable relationship to the degree and kind of wrong it is intended to remedy. United States v. Deaton, 332 F.3d 698, 714 (4th Cir. 2003); Ciampitti, 615 F. Supp. at 122-23; United States v. Weisman, 489 F. Supp. 1331, 1343 (M.D. Fla.), aff'd, 632 F.2d 891 (5th Cir. 1980); United States v. Cumberland Farms of Conn., Inc., 647 F. Supp. 1166, 1180 (D. Mass 1986), aff'd, 826 F.2d 1151 (1st Cir. 1987).

B.    Civil Penalty

The CWA also provides that any person who violates the Act "shall be subject to a civil penalty not to exceed $25,000 per day for each violation." 33 U.S.C. § 1319(d) (emphasis added); Tull, 481 U.S. at 414.[2] "If a district court finds a violation [of the Act], then civil penalties under 33 U.S.C. § 1319(d) are mandatory." NRDC v. Southwest Marine, Inc., 236 F.3d 985, 1001 (9th Cir. 2000); Leslie Salt Co. v. United States, 55 F.3d 1388, 1397 (9th Cir. 1995); Atlantic States Legal Found., Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1142-43 (11th Cir. 1990). Because this Court has determined that the Defendant violated the CWA, a civil penalty is mandatory in this case.

---

[2] Congress authorized the government to adjust civil penalties for inflation. The maximum penalty is $27,500 per day for violations that occur after January 30, 1997, 61 Fed. Reg. 69,360, 69,365 (Dec. 31, 1996), and $32,500 per day for violations that occur after March 15, 2004, 69 Fed. Reg. 7121, 7125 (Feb. 13, 2004).

Page 4

When imposing a penalty for CWA violations, it is well settled that a court should "consider the need for retribution and deterrence, in addition to restitution." Tull, 481 U.S. at 422-23.[3] A penalty should be "large enough to hurt; it should deter anyone in the future from showing a similar lack of concern with compliance." United States v. Envtl. Waste Control, Inc., 710 F. Supp. 1172, 1244 (N.D. Ind. 1989), aff'd, 917 F.2d 327 (7th Cir. 1990). The Court must not only determine the amount of penalty that will force the Defendant to comply with the CWA (specific deterrence), but also the amount of penalty that will prevent others from acting in similar disregard of the law (general deterrence). The Court should award a penalty that considerably exceeds what the Defendant and similarly situated persons might be willing to absorb as a cost of doing business.[4]

## FACTUAL BACKGROUND

The Court made numerous findings of fact in its Memorandum and Order dated March 26, 2002, ruling that the Defendant discharged fill material into 1.771 acres of wetlands in violation of the CWA. Donovan, Civ. No. 96-484 [Dkt. 51]. The Court's findings are relevant to the remedy and penalty phase, and are incorporated by reference.

On April 22, 2005, the Court entered a Rule 16 scheduling order. [Dkt. 70]. The order provided that Plaintiff's expert reports were due by August 1, 2005, Defendant's expert

---

[3] See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 185-86 (2000); Sierra Club v. Simkins Indus., Inc., 847 F.2d 1109, 1113 (4th Cir. 1988).

[4] United States v. ITT Continental Baking Co., 420 U.S. 223, 231 (1975); PIRG v. Powell Duffryn Terminals, Inc., 720 F. Supp. 1158, 1166 (D.N.J 1989) ("civil penalty must be high enough to insure that polluters cannot simply absorb the penalty as a cost of doing business"), aff'd in part, rev'd in part on other grounds, 913 F.2d 64 (3d Cir. 1990); see United States v. Smithfield Foods, Inc., 191 F.3d 516, 530 (4th Cir. 1999).

reports were due by August 29, 2005, and "[a]ny party desiring to depose an expert witness shall notice and complete said deposition no later than thirty (30) days from receipt of said expert's report, unless agreed in writing by the parties." Id. By August 1, 2005, the United States provided Defendant with expert reports by (1) Jeffrey Steen, an expert in wetland restoration; (2) Joseph Gerber, an expert in forensic accounting; (3) Gerry Harris, a business expert; and (4) Philip J. McGinnis, an expert in real estate valuation. Defendant has not identified any expert witnesses, provided any expert reports, or taken any depositions.

Defendant has also refused to provide any information regarding his finances. The United States first requested such information on April 26, 1999, in written discovery requests. Defendant, however, refused to produce any financial information, even after the United States filed a motion to compel responses on July 21, 1999 [Dkt. 29 and 30]. Defendant again refused to provide any financial information during his deposition on July 7, 2000. Donovan Dep. at 157-58, 168-70 (U.S. Exhibit 2).

I.    Harm To The Environment And Community As A Result of Defendant's 1.771 Acre Clean Water Act Violation.

The 1.771 acres of wetlands Defendant destroyed previously provided four important functions for the environment and the surrounding community. First, the wetlands "retained eroded sediments, intercepted pollutants, and helped to purify waters that drained from nearby developed lots and roadways, including State Route 13" that would otherwise enter Sawmill Branch and its tributaries, the Smyrna River, and ultimately Delaware Bay. Steen Declaration ¶¶ 11, 17-23 (U.S. Exhibit 3).[5] The United States' restoration further explained:

---

[5] Mr. Steen's qualifications as an expert are set forth in Paragraphs 4-6 and Ex. 1 to his declaration. Steen Declaration ¶¶ 4-6 and Ex. 1 (U.S. Exhibit 3).

> Wetlands are capable of removing impurities from water through a variety of physical, chemical and biological processes. Among them, wetland vegetation and sediments filter impurities through physical processes. Vegetation within wetlands reduces water flow which allows suspended material to settle out of the water column. Particulates may attach themselves to plant material or to sediments. Chemical and biological processes may break down impurities, including pollutants, to more simple non-toxic compounds. Pollutants may serve as a food source for bacteria and other microbes living within wetlands.

Id. ¶ 11. The wetland's "ability to purify runoff waters, including storm water, was an important natural resource function that was valuable to public health." Id. ¶ 17. The wetlands Defendant destroyed no longer provide this important function. Id. ¶¶ 17, 23.

Second, the wetlands Defendant destroyed "detained storm water" and "slowed the release of storm water downstream." Id. ¶ 18. This "diminishes flood peaks and extends the time that flood water drains into nearby waters," which reduces flooding and erosion on downstream agricultural, residential and commercial properties. Id. The wetlands Defendant destroyed no longer provide these important functions. Id. ¶¶ 18, 23.

Third, the wetlands Defendant destroyed "were part of the larger flood plain of the Smyrna River drainage" and provided important flood plain benefits. Id. ¶ 19. "Maintaining naturally occurring flood plains provides storage areas for flood waters, protects the integrity of streams, and diminishes the likelihood of flooding of adjacent and downstream lands." Id. "The loss of naturally occurring flood plains results in flood waters reaching into areas that were not traditionally flooded" and "can result in serious adverse impacts to natural areas as well as to people, their homes, and their livelihoods." Id. The wetlands Defendant destroyed no longer safeguard the surrounding land. Id. ¶¶ 19, 23.

Page 7

Finally, the wetlands Defendant destroyed provided habitat for wildlife. Id. ¶¶ 20-22. The wetland (hydric) soil that Defendant buried under a thick blanket of fill material was "well suited" for "supporting hardwood plants, wetland food and cover plants, shallow water features, ponds, woodland wildlife, and wetland wildlife." Id. ¶¶ 15, 20. By burying the wetland soil and vegetation, Defendant "severely diminished" the wetlands' wildlife function. Id. ¶¶ 20, 23.

The loss of Defendant's wetlands also contributes to fragmentation of the remaining forested wetland habitat in New Castle County by eliminating important physical links between the remaining undisturbed areas. Steen Declaration ¶¶ 21, 23. Defendant's wetlands "were part of a forested complex that extended west of Sawmill Branch to Delaware's Blackbird State Forest west of Route 13." Id. ¶ 21. "The continuity in these remaining forestlands are important to wildlife because they allow uninhibited movement within a larger habitat area." Id. "Such fragmentation of habitat typically reduces species diversity, wildlife populations, and restricts wildlife movement, a necessary component of maintaining healthy species populations." Id. Thus, the loss of Defendant's wetlands contributes to the further fragmentation of remaining forestland. Id. ¶¶ 21, 23.

Finally, the loss of Defendant's wetlands is harmful to migratory birds. Id. ¶¶ 22, 23. "[N]early 30 percent of bird species found living in or migrating through Delaware are imperiled" because more than half of Delaware's wetlands have been lost. Id. ¶ 22. "The loss of forest habitat has had a similar effect on more than 40 percent of the bird species living in or migrating through Delaware." Id. The loss of Defendant's forested wetlands contributes to this downward trend in bird populations. Id. ¶¶ 22, 23.

II.    Defendant Is Able To Pay A Significant Civil Penalty.

Defendant has amassed at least $490,000 in real estate, $166,302 in accounts at

Wilmington Trust Company and Bank of America, and $5,870 in a brokerage account at Man

Financial as of August 2005. Gerber Affidavit ¶¶ 9, 14-15, 21, 23, 26-27, 32 and Gerber

Exs. 6, 9-10, 19, 21, (U.S. Exhibit 4).[6] Defendant may also have additional assets. It is not

possible to determine the full extent of Defendant's wealth at this time because he has used

shell companies, including an off-shore company allegedly located in the British West Indies,

and a false social security number to hide his wealth. Id. ¶¶ 8, 9-18 and Gerber Exs. 2- 6.[7]

A.    Real Estate Holdings.

New Castle County property records demonstrate that from 1959 to 2005, Defendant

bought and sold approximately 20 pieces of real estate that he transferred back and forth

numerous times among shell companies, including Miscella Queen Company and A&P

---

[6] Joseph Gerber's qualifications as an expert are set forth in Paragraphs 1-4 and
Attachment 1 to his affidavit. Gerber Affidavit ¶¶ 1-4 and Gerber Ex. 1 (U.S. Exhibit 4).

[7] The United States provided the Defendant and the Court with a complete set of the
financial and insurance records that were analyzed to determine the Defendant's ability to
pay a civil penalty. On October 5, 2005, the United States filed "Supplemental
Disclosures" containing Wilmington Trust Company documents WTO1 through
WTO114; Bank of America documents BOA01 through BOA0128; Man Securities
documents MS1 through MS83; Man Financial documents MF1 through MF93 and State
Farm Insurance documents SF1 through SF535. Supplemental Disclosures Pursuant to
Rule 26 [Dkt. 74]. On November 30, 2005, the United States filed "Additional
Supplemental Disclosures" containing State Farm Insurance documents SF536 through
766. Additional Supplemental Disclosures Pursuant to Rule 26 [Dkt. 75]. The custodian
of records at Wilmington Trust Company and Bank of America have provided written
declaration pursuant to Federal Rule of Evidence 902(11). The declaration of Allison A.
Berl, the custodian of records for Wilmington Trust Company, authenticating documents
WTO1 through WTO114, is attached as U.S. Exhibit 7. The declaration of Elizabeth A.
Stanford, the custodian of records for Bank of America, authenticating documents BOA01
through BOA0128, is attached as U.S. Exhibit 8.

Group (also listed as A-P Group and A+P Group), to conceal his assets from creditors. Gerber Affidavit ¶¶ 8, 9,10-12 and Gerber Exs. 2-8 (U.S. Exhibit 4).[8] Miscella Queen has figured prominently in more than 30 transactions involving the 20 properties, especially in the last seven years. Id. ¶ 10. Although preliminary research disclosed addresses for Miscella Queen in Mardella Springs, Maryland; RR1 Box 284D, Seaford, Delaware; and 491 Massey Church Road, Smyrna, Delaware, there were no records of incorporation in either state or any other business records for this company. According to an indenture between Miscella Queen and A&P that was recorded in the New Castle County property records on February 25, 1998, Miscella Queen Company is a company of the British West Indies. Id. ¶ 11 and Gerber Ex. 2.

A+P/A&P/A-P Group, with addresses listed at Wicomico County, Maryland and RR1, Box 284D, Seaford, Delaware was also involved in numerous transactions involving the same 20 properties. Donald L. Donovan is involved with A+P property transactions. He is apparently the Defendant's son and is currently incarcerated following his January 2004 conviction for tax evasion. Gerber Affidavit ¶ 12 and Gerber Exs. 7-8. A&P Group and Defendant were co-plaintiffs in a law suit filed in Chancery Court on May 11, 2000, in Wilmington, Delaware. Id. ¶ 8 and Gerber Exs. 2-5.

1.    Donovan's Personal Residence.

New Castle County property records demonstrate that the Defendant owns a personal residence, a single-family home, at 517 Massey Church Road, Smyrna, Delaware, that was

---

[8] If the Court requests, the United States will file certified copies of the New Castle County property records that are discussed and cited in Mr. Gerber's affidavit.

appraised at $190,000 on July 16, 2005. McGinnis Affidavit ¶ 2, 3 and McGinnis Ex. B, 34-42 (U.S. Exhibit 5)[9]; Gerber Affidavit ¶ 14 and Gerber Exs. 6, 9-10 (U.S. Exhibit 4).

      2.    Donovan's Investment Property.

New Castle County property records demonstrate that Defendant also owns 8.7 acres of real property at 491 Massey Church Road, Smyrna, Delaware, which was appraised at $300,000 as of July 16, 2005. McGinnis Affidavit ¶¶ 43-54 (U.S. Exhibit 5); Gerber Affidavit ¶15 and Gerber Exs. 6, 11-14 (U.S. Exhibit 4). Improvements on the property include two individual dwellings, a garage/shop with an apartment overhead, and a pole barn. McGinnis Affidavit ¶ 43. Defendant and his wife acquired the property in October 1963. On February 13, 1998, Defendant and his wife issued a deed for the property in lieu of foreclosure to Miscella Queen Company. Donovan claimed to be doing business as Miscella Queen on some of his insurance applications that are on file with State Farm Mutual Automobile Insurance Company. On February 22, 1998, Miscella Queen Company transferred the property to A&P Group. In July 2002, A&P Group issued a Quit Claim Deed returning the property to Miscella Queen Company. Documents obtained from State Farm indicate that the Defendant and his wife have three active policies for rental dwellings. It is not clear whether these policies relate to the three dwellings at 491 Massey Church Road or different property. Gerber Affidavit ¶¶ 15-16 and Gerber Exs. 6, 11-14 (U.S. Exhibit 4).

---

[9] Philip J. McGinnis' qualifications as an expert are set forth in Paragraph 1 to his affidavit. McGinnis Affidavit ¶ 1 (U.S. Exhibit 5).

### 3. Other Investment Property.

It is not clear whether the Defendant currently owns real estate in addition to his personal residence at 517 Massey Church Road and investment property at 491 Massey Church Road. For example, county property records indicate that the Defendant and his wife acquired 72 acres of farmland at 0 SS Union Church Road, Townsend, Delaware in 1976. In February 1998, Defendant transferred the property to Miscella Queen Company. Five days later Miscella Queen Company transferred it to A&P Group. This property has not been appraised because further investigation is required to determine the extent of Defendant's interest in the A&P Group. Gerber Affidavit ¶ 18 and Gerber Exs. 15-17 (U.S. Exhibit 4).

### B. Hauling Business.

From at least 1978 to 2000, Defendant operated a hauling business under the name Blackbird Hauling and utilized several dump trucks. Id. ¶ 19. A document furnished by Man Financial, a brokerage firm in Chicago, Illinois, with a fax date of February 12, 1996, from Dave Donovan to Dave Nokolai advises that "The enity (sic) Blackbird Hauling is completely owened (sic) by David Donovan, it is a name I do hauling under and no other person has any financial interest in it." Id. ¶ 22. Insurance documents from State Farm Mutual Automobile Insurance Company demonstrate that the Defendant owned one or more dump trucks at all times from at least October 1979 to June 2000. Id. ¶ 20. Based upon information concerning similar trucks, the capacity of the dump trucks Defendant owned between June 1987 and December 1997, when the CWA violations occurred, was 18 cubic

yards. Id. Some of the insurance policies identify the Defendant doing business as Miscella Queen. Id.[10]

According to a Wilmington Trust business signature card dated July 16, 1992, David H. Donovan, President, is the only signer on account number 2550-8084, which is in the name of Blackbird Hauling, 517 Massey Church Rd., Smyrna, Delaware. During the period January 2000 to April 2005, monthly deposits/credits (excluding January 2005, which is missing) averaged $4,312.36. The amount of the monthly deposits/credits ranged from zero to $50,813.71. In May 2005, monthly deposits/credits totaled $258,986.90, including a deposit in the amount of $257,465.00, dated May 6, 2005. Gerber Affidavit ¶ 23 (U.S. Exhibit 4). County property records demonstrate that Donovan sold four pieces of real estate on May 2, 2005, which may account for the large deposit. On May 23, 2005, check number 7835 in the amount of $200,000 was charged to the account. This check was apparently deposited into an account held by Queen Holdings, Inc., another one of Defendant's business entities, at Bank of America. The balance in the Blackbird Hauling account was $41,293.58 on July 29, 2005. Id.

C.    Queen Holdings, Inc.

Queen Holdings, Inc. was incorporated in the State of Nevada on July 3, 2001. Gerber Affidavit ¶ 24 (U.S. Exhibit 4). The articles of incorporation identify Ron Kirzinger, of 5344 Images Court, Las Vegas, Nevada, as the incorporator and sole initial member of the board of directors, and designate Budget Corporate Renewals, Inc., at the same address, as

_____

[10] Donovan also has active auto insurance policies for a 1988 GMC 2500 pickup truck, a 1987 Lincoln Town Car, and a 1994 Lincoln Town Car. Id.

the resident agent. The internet site for Budget Corporate Renewals, Inc., boasts that people should incorporate in Nevada if they "have . . . any assets to protect" because (1) "Nevada [is] the only state that does not freely share its records with the Internal Revenue Service," (2) "in Nevada there have only been two cases since 1975 in which the corporate veil has been pierced," and (3) "Nevada is one of only a small handful of states that allows the use of bearer shares," which makes it "very difficult for an outsider to establish the ownership of a company." Gerber Affidavit ¶ 25 (U.S. Exhibit 4).

### 1.    Bank of America Account

Queen Holdings, Inc., maintains bank account number 0049 6192 2906 at Bank of America. Id. ¶ 23. According to a corporate signature card for that account dated July 10, 2001, the only two people who are authorized to draw on the account are the Defendant and his wife, who are each identified as vice presidents. Id. ¶ 23. The statements for this account were sent to the address for Ron Kirzinger and Budget Corporate Renewals, Inc., from July 2001 until July 2002. Since July 2002 the statements have been sent to Defendant's personal residence at 517 Massey Church Road in Smyrna, Delaware. Id. ¶ 24.

During the period July 2001 to December 2003, Defendant transferred $67,000 from the Blackbird Hauling account at Wilmington Trust Company to the Queen Holdings, Inc. account at Bank of America. Excluding the Blackbird Hauling transfers, monthly deposits/credits averaged $1,738.42. During the period January 2004 to April 2005, deposits totaled $264.75. During the period May 2005 to July 2005, the only deposit was a check from Blackbird Hauling in the amount of $200,000, as noted above. The balance in the account on July 31, 2005 was $125,009.27. Gerber Affidavit ¶ 26 (U.S. Exhibit 4).

Page 14

2.    Man Financial Account

In April 2002, Defendant opened brokerage account number HA21 6683-1794 in the name of Queen Holdings, Inc. at Man Financial.  Total assets are reported to be $60,000 in cash.  Liabilities are reported to be zero.  An account guarantee form identifies the Defendant as the guarantor with an income of approximately $50,000, and a net worth of approximately $300,000.  Id. ¶ 30.  Monthly statements from April 2002 to August 2005 (except for nine missing statements including 6/03, 10/03, 11/03, 2/04, 4/04, 5/04, 7/04, 8/04 and 10/04), show deposits totaling $24,060.95, including a $23,800 deposit from the Queen Holdings, Inc. account at Bank of America.  The only other deposit was $260.95 identified as "trf frm fut 10966056," on January 14, 2004.  The only withdrawal was $3,700 on May 8, 2003, identified as "trf to fut 10966056."  The total account value on August 31, 2005, was $5,870.85.  Id. ¶ 32.

D.    Personal Brokerage/Investment Accounts.

From February 1996 until January 2004, Defendant maintained brokerage account number I 108 *** 36786 in his own name at Man Financial.  Documents from Man Financial identify Defendant's occupation as "owner operator truck" with an annual income of $25-50,000, net worth of $250,000, and liquid net worth of $125,000.  Id. ¶ 28.  A document dated February 7, 1996 entitled, "Backup Withholding and Transactions Reporting Requirements" "Combined W-9, W-8, and 1099-B Certifications," reports Defendant's social security number as 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.  Id. ¶ 8.  Defendant's true social security number is 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.  Id. ¶ 8.  Monthly statements from January 1998 to January 2004 (except 2/99, 8/01, 11/1, and 4/03, which are missing), show that the beginning balance on January 1, 1998

was $11,090.77, and that five deposits totaling $26,000 were subsequently made. On January 16, 2004, a check equal to the account balance, $642.85, was issued, apparently closing the account. Id. ¶ 29.

### E.    Cash On Hand In July 2005.

The combined total cash on deposit in the Blackbird Hauling account at Wilmington Trust Company and the Queen Holdings, Inc. account at Bank of America at the end of July 2005 was $166,302.85. Id. ¶ 27. Including the assets from Man Financial, Defendant had more than $170,000 in liquid assets. Id. ¶¶ 27, 32.

### STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine dispute of material facts, and judgment should be granted as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). While the initial burden is on the moving party to establish the absence of genuine issues of material fact, the Supreme Court has held that the nonmoving party must meet more than a minimal burden in order to prevent entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A motion for summary judgment cannot be defeated by the existence of merely "some alleged factual dispute between the parties." Id. at 247. Rather, the nonmoving party must set forth specific facts showing that there is a genuine issue of a material fact for trial. Id. at 248; Celotex, 477 U.S. at 323. Merely colorable evidence, Dombrowski v. Eastland, 387 U.S. 82, 84 (1967) (per curiam), or insignificant probative evidence, First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 290 (1968), will not defeat summary judgment.

ARGUMENT

I.   THE COURT SHOULD ISSUE AN INJUNCTION THAT REQUIRES THE DEFENDANT TO RESTORE THE 1.771 ACRES OF WETLANDS HE DESTROYED.

The United States requests that the Court order the Defendant to complete the "Dredged and/or Fill Material Removal and Wetlands Restoration Plan" ("Wetland Restoration Plan"), which is attached as Exhibit 7 to the Declaration of Jeffrey Steen (U.S. Exhibit 3). The Wetland Restoration Plan was designed by the United States' wetland restoration expert, Jeffrey Steen, and provides a practical blueprint for restoring the 1.771 acres of wetlands the Defendant destroyed and the important functions they provided.

The proposed Wetland Restoration Plan sets forth "a simple two-step process" that should successfully reestablish all of the wetland's functions. Steen Declaration ¶ 27 (U.S. Exhibit 3). This process has been used throughout the mid-Atlantic region with a very high degree of success. Id. ¶ 25. The first step is to remove the fill material to the previously existing ground surface. Id. ¶ 27 and Steen Ex. 7 ¶¶ 1-2, 6, 8, 10. The second step is to seed the restoration area with a wetland seed mix that will "reestablish a ground cover with wetland species typical of the area and stabilize the restoration site to prevent erosion" until wetland trees and shrubs naturally revegetate the site. Id. ¶ 30 and Steen Ex. 7 ¶¶ 12, 18.

A.   The United States' Proposed Wetland Restoration Plan Will Confer Maximum Environmental Benefits.

In selecting an appropriate wetland restoration plan, the Court should first consider whether the proposed plan will confer maximum environmental benefits. See supra at 3. Maximum environmental benefits are conferred when wetlands that have been illegally

destroyed are restored to their undeveloped state and the ecological benefits they provided are replaced. Ciampitti, 615 F. Supp. at 123 ("return of the wetlands area to its undeveloped state would confer maximum environmental benefits"); United States v. Bradshaw, 541 F. Supp. 884, 885-86 (D. Md. 1982) (replacing "crucial ecological benefits which were eliminated by defendant's unlawful action" confer maximum environmental benefits); Cumberland Farms, 647 F. Supp. at 1181-82 (same).

The proposed Wetland Restoration Plan is specifically tailored to restore the 1.771 acres of wetlands Defendant destroyed and to restore the important functions they provided for the environment and the community. The first part of the restoration, "[r]emoving the unauthorized fill material to the previously existing ground surface[,] would expose the original topography, hydric soil (Fallsington series), and hydrologic conditions." Steen Declaration ¶ 27 (U.S. Exhibit 3). This "would immediately reestablish certain of the site's natural resource values such as storm water retention/detention, flood attenuation, and flood plain values." Id. ¶ 31. The second part of the restoration, seeding the area with a wetland seed mix, "will reestablish a ground cover with wetland species typical of the area and stabilize the site to prevent erosion." Id. ¶ 30.

The remaining wetland functions, such as water purification and wildlife habitat, would be restored over time as the area naturally revegetates with wetland trees and shrubs. Id. ¶ 32. The restoration area is "largely surrounded by wetlands" that "will provide an abundant source of seeds for wetland trees and shrubs that will recolonize the restored wetlands." Id. ¶ 30. Over time the plants will grow to maturity and fully reestablish the functions and values of the currently filled wetlands. Id.

Page 18

Thus, the proposed Wetland Restoration Plan will confer the maximum environmental benefits because it should restore the wetlands and the important water purification, storm water detention, flood attenuation, flood plain, and wildlife habitat functions they previously provided.

B.      The Wetland Restoration Plan Is Achievable As A Practical Matter.

"Achievable as a practical matter" means technically competent, furthering the public good, and worth attempting. Cumberland Farms, 647 F. Supp. at 1182-83. To be achievable, the Wetland Restoration Plan must be feasible and cost effective. Ciampitti, 615 F. Supp. at 123. It need not identify every construction and cost detail. Rather, a presentation of restoration goals is enough. Id.

The first step of the restoration — removing the fill material to reestablish the wetland's storm water detention, flood attenuation, and flood plain functions — should be simple to complete because the "fill material is easily distinguished from the previously existing surface of the ground." Steen Declaration ¶¶ 27, 29, 31 (U.S. Exhibit 3). The fill material "is typically bright in color," whereas the underlying wetland soil "is dark grayish-brown." Id. In addition, the Defendant likely placed the fill material directly on top of plant material that was growing in the wetland. Id. The plant material "will appear, and will be readily apparent, as the fill material is removed." Id. Finally, "Corps staff trained in wetland restoration will be present to oversee the restoration work." Id.

The second step, seeding the area with a grass seed mix, will prevent erosion after the earth work and allow the wetland to naturally re-vegetate. Steen Declaration ¶ 30 (U.S. Exhibit 3). As the restored area develops into a mature forested wetland, water purification

Page 19

and wildlife habitat functions should be reestablished. Id. ¶ 32. There is a high likelihood that these remaining functions will be successfully restored because Defendant's wetland was part of a larger wetland complex that is still intact, largely surrounds the restoration site, and should provide "an abundant source of seeds for wetland trees and shrubs that will recolonize the restored wetland." Id. ¶¶ 30, 32.

The growth of woody vegetation and full restoration of water purification and habitat functions could be hastened by planting wetland trees and shrubs at a rate of 600 to 800 plants per acre, in addition to the wetland seed mix. Id. ¶ 30. The United States has not requested this additional step or annual monitoring "because of the high likelihood that the restoration will be successful without these work items," "to simplify the restoration work," and "to minimize the cost to the Defendant." Id. ¶ 34. Thus, the Wetland Restoration Plan is not only feasible, it is cost effective.

Given the simplicity of the Wetland Restoration Plan and the presence of wetlands that largely surround the restoration site, there is a "high likelihood" that the restoration will be successful and the wetlands will once again provide water purification, storm water detention, flood attenuation, flood plain, and wildlife habitat functions. Id. ¶ 33.

C.    The Wetland Restoration Plan Bears An Equitable Relationship To The Degree And Kind Of Wrong It Is Intended To Remedy.

A restoration plan bears an equitable relationship to the degree and kind of wrong that it is intended to remedy when the defendant's burden of performing the plan is commensurate with the defendant's culpability. Cumberland Farms, 826 F.2d at 1165. The

proposed Wetland Restoration Plan is designed to remove only the fill material the Defendant illegally discharged and restore the wetland functions the Defendant destroyed.

As the Court determined, Defendant's illegal conduct took place despite repeated warnings from the Corps and requests that he apply for a permit to work in the wetlands. Donovan, Civ. No. 96-484, slip op. ¶¶ 5-14 [Dkt. 51]. Rather than comply with the law, Defendant declared his property and himself immune from federal and state law, sent a threatening letter to the federal regulatory official overseeing his case, and violated not one, but three cease and desist letters. Id. ¶¶ 10-14 [Dkt. 51]; U.S. Exhibit 1. A defendant who acts in such disregard of cease and desist orders is in no position to argue equity. United States v. Pozsgai, 999 F.2d 719, 736 (3d Cir. 1993) ("repeated noncompliance with the Act and with the Corps' directives to stop filling foreclose any such equitable argument"); Ciampitti, 615 F. Supp. at 124; United States v. Robinson, 570 F. Supp. 1157, 1165 (M.D. Fla. 1983). Similarly, Defendant lacks grounds to make equitable arguments because he disregarded the opinions of the Corps' experts on wetland jurisdiction. Donovan, Civ. No. 96-484, slip op. ¶¶ 5-14 [Dkt. 51]; Robinson, 570 F. Supp. at 1164, 1165.

Finally, because Defendant discharged fill material into wetlands he owns, there is no risk that the Wetland Restoration Plan would impose obligations on an innocent person. See Cumberland Farms, 647 F. Supp. at 1183. Although the Wetland Restoration Plan will place a burden on the Defendant to complete the work, he has no one to blame but himself for that burden. Thus, the Wetland Restoration Plan bears an equitable relationship to the wrong it is intended to remedy. See Van Leuzen, 816 F. Supp. at 1173, 1180.

Page 21

II.    THE COURT SHOULD ORDER THE DEFENDANT TO PAY A $256,000 CIVIL
PENALTY.

The facts of this case require a substantial civil penalty against the Defendant because

his conduct was willful and in disregard of repeated efforts by regulators to work with him

to apply for and obtain a permit <u>before</u> the violations occurred.  The $25,000 per day per

violation maximum penalty, which was increased in 2004 to $32,500 to adjust for inflation,

demonstrates that Congress' intended all citizens to take this law seriously.  Defendant's

violations mandate a significant penalty that sends a clear message to individuals who hold

themselves above the law.

A.    In Calculating An Appropriate Penalty, The Court Must Start With The
Statutory Maximum.

In calculating the penalty, the Court should begin by determining the statutory

maximum and then adjust downward based on the factors in CWA section 309(d). 33 U.S.C.

§ 1319(d).  <u>Atlantic States</u>, 897 F.2d at 1137 ("the point of departure for the district court

should be the maximum fines for such violations permitted by the Clean Water Act").[11]

Section 309(d), which authorizes penalties "per day for each violation," does not

place a cap on the number of violations someone can commit in a given day. 33 U.S.C. §

1319(d); <u>Atlantic States</u>, 897 F.2d at 1138-39; <u>Smithfield Foods</u>, 191 F.3d at 527. Each day

---

[11]  <u>See also</u> <u>Sierra Club v. Cedar Point Oil Co.</u>, 73 F.3d 546, 573-76 (5th Cir. 1996);
<u>United States v. Gulf Park Water Co.</u>, 14 F. Supp. 2d 854, 858 (S.D. Miss. 1998) (court
uses "top down" method for calculating penalty in Clean Water Act case); <u>Hawaii's
Thousand Friends v. City & County of Honolulu</u>, 821 F. Supp. 1368, 1395 (D. Haw.
1993) (same); <u>Atlantic States Legal Found. v. Universal Tool & Stamping Co.</u>, 786 F.
Supp. 743, 746-47 (N.D. Ind. 1992); <u>United States v. Roll Coater</u>, 21 Envtl. L. Rep.
(Envtl. L. Inst.) 21073, 21075 (S.D. Ind. 1991) (U.S. Exhibit 11).

fill material remains in wetlands without a permit is an additional day of violation.[12] Section 309(d) allows calculating a statutory maximum penalty for each separate discharge of fill material, and for each day that fill remains in place. 33 U.S.C. § 1319(d).

Defendant dumped between 478 and 635 dump truckloads of fill material into the 1.771 acre wetland. Steen Declaration ¶ 29 (U.S. Exhibit 3). This was calculated by dividing the volume of fill the Defendant discharged into the wetland by the volume of the dump trucks he owned when the violations occurred. Based upon site inspection reports, the Defendant discharged three to four feet of fill material into 1.771 acres of wetlands. Id. ¶ 28. Multiplying the area of unauthorized fill, 1.771 acres, by the average depths of the fill, 3 to 4 feet, and dividing the resulting numbers by 27, the number of cubic feet in one cubic yard, yields between 8,572 (3 foot depth) and 11,429 (4 foot depth) cubic yards of fill material. Id. Dividing the volume of fill material, 8,572 to 11,429 cubic yards, by the volume of the trucks Defendant owned, 18 cubic yards,[13] yields 478 to 635 truckloads. Id.

Each dump truckload is a separate violation of the CWA. Borden Ranch P'ship v. United States Army Corps of Eng'rs, 261 F.3d 800, 817 (9th Cir. 2001). "Here, the landowner committed the same unlawful act repeatedly." Id. at 818. In such circumstances,

---

[12] Sasser v. EPA, 990 F.2d 127, 129 (4th Cir. 1993) ("Each day the pollutant remains in the wetlands without a permit constitutes an additional day of violation."); Informed Citizens United, Inc. v. USX Corp., 36 F. Supp. 2d 375, 377 (S.D. Tex. 1999); United States v. Reaves, 923 F. Supp. 1530, 1534 (M.D. Fla. 1996); United States v. Key West Towers, Inc., 720 F. Supp. 963, 964 n.1 (S.D. Fla. 1989); United States v. Ciampitti, 669 F. Supp. 684, 700 (D.N.J. 1987); Cumberland Farms, 647 F. Supp. at 1183.

[13] Defendant's 18 cubic yard dump trucks are consistent with the size truck that would be used for a project of this size. "Typically, on construction projects of this magnitude, fill material is brought to the project site in dump trucks with a capacity to carry between 10 and 20 cubic yards of material." Steen Declaration ¶ 29 (U.S. Exhibit 3).

[t]he statute imposes a maximum penalty "per day for each violation." 33
U.S.C. § 1319(d). It does not say "per each day in which violations occur"
or "per day in which a party pollutes." The focus is clearly on *each* violation,
and courts have consistently rejected attempts to limit civil penalties to the
number of days in which violations occur. A contrary rule would encourage
individuals to stack all their violations into one "Pollution Day," in which
innumerable offenses could occur, subject only to the $25,000 maximum.

Id. at 817; Atlantic States, 897 F.2d at 1138-39; Smithfield Foods, 191 F.3d at 527. Thus,

the defendant committed at least 478 violations.

Based upon the significant number of violations, the maximum civil penalty is

between $11,950,000 (478 truckloads multiplied by $25,000 per violation) and $15,875,000

(635 truck loads multiplied by $25,000 per violation). Because the depth of the fill varied

between three and four feet, the United States is calculating the maximum civil penalty to

be $11,950,000, based upon the more conservative three feet of fill. This calculation is also

conservative because it does not include an additional assessment for each day the Defendant

has allowed the fill material to remained in place since 1993.

    B.    The Court Should Reduce The Maximum Penalty Only To The Extent
        Defendant Establishes The Existence Of Mitigating Factors.

The United States does not contend that the Court should impose the maximum

statutory penalty in this case. Rather, it believes that the Court should reduce the penalty to

$256,000 pursuant to the factors set forth in CWA section 309(d). Atlantic States, 897 F.2d

at 1142; Gulf Park, 14 F. Supp. 2d at 858-68; Roll Coater, 21 Envtl. L. Rep. at 21,075 (U.S.

Exhibit 11). The mitigating factors the Court may consider are: "the seriousness of the

violation or violations, the economic benefit (if any) resulting from the violation, any history

of such violations, any good-faith efforts to comply with the applicable requirements, the

economic impact of the penalty on the violator, and such other matters as justice may require." 33 U.S.C. § 1319(d); United States v. Municipal Auth. of Union Township, 150 F.3d 259, 261 (3rd Cir. 1998). Defendant bears the burden of establishing the facts entitling him to such mitigation.[14]

Gulf Park provides an excellent example of the appropriate procedure this Court should use to establish a penalty in this case. There the court calculated a statutory maximum of over $46 million, which it then reduced to $1.5 million based upon an analysis of the section 309(d) factors. 14 F. Supp. 2d at 869. Similarly, in Roll Coater the court reduced a $53 million penalty to $2 million based upon the section 309(d) factors. 21 Envtl. L. Rep. at 21,075-77 (U.S. Exhibit 11). See also United States v. Key West Towers, Inc., 720 F. Supp. at 965-66 (analysis of 309(d) factors).

      1.    The Violations Are Serious.

The seriousness of the violations is established by looking to "'several factors, including, but not limited to: (1) the number of violations; (2) the duration of noncompliance; (3) the significance of the violation (degree of exceedance and relative importance of the provision violated); and (4) the actual or potential harm to human health and the environment.'" Gulf Park, 14 F. Supp. 2d at 859, quoting Hawaii's Thousand Friends, 821 F. Supp. at 1383.

---

[14] See Roll Coater, 21 Envtl. L. Rep. at 21075 (consideration of seriousness of violation at the penalty phase places the issue of environmental harm on the defense) (U.S. Exhibit 11); NRDC v. Texaco Refining & Marketing, Inc., 800 F. Supp. 1, 26 (D. Del. 1992) (defendant did not demonstrate that a large penalty would have an adverse impact on the company), aff'd in part, rev'd in part on other grounds, 2 F.3d 493 (3d Cir. 1993).

a.    Number Of Violations.

Despite multiple invitations to apply for a permit and three cease-and-desist orders, Defendant discharged between 478 and 635 truckloads of fill over an extended period of time, each of which constitutes a separate violation of the Clean Water Act. The number of the violations merits a substantial penalty.

b.    Duration And Degree Of The Violations.

The duration of the violations in this case is considerable. After Defendant illegally discharged the fill material into the wetlands, he simply left it in place and has been in flagrant and continuous violation of the CWA for more than 12 years.

The degree of the violations, i.e. the extent to which Defendant violated the statute, also does not justify any reduction in penalty. See, e.g., Public Interest Research Group v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 79 (3d Cir. 1990). Defendant's violations were flagrant because they occurred despite repeated invitations by the Corps to apply for and obtain an appropriate CWA permit before the violations occurred, repeated warnings from the Corps, three cease and desist letters, the filing of this federal enforcement action, and this Court's March 26, 2002 ruling that Defendant violated the CWA. This noncompliance is exacerbated by the fact that Defendant declared his property and himself immune from federal and state law and sent a threatening letter to a federal regulatory official.

c.    Environmental Significance Of The Violations.

The Defendant destroyed a significant area of wetlands – 1.771 acres. As discussed above, the wetlands were an important public resource that provided water purification, flood and storm flow attenuation, and habitat for wildlife.

d.    Adverse Effect On The Public.

In addition to the harm discussed above, Defendant's activities have a national policy impact. The primary way the government monitors the existence, use and loss of wetlands, and meaningfully grant permits where appropriate, is through a citizen self-reporting system under which persons who anticipate placing fill material in wetlands apply for a permit, which, if granted, may limit and minimize the extent and type of impact from the project. When people refuse to apply for a permit, they eviscerate the principal system for monitoring and reducing the loss of and impacts to wetland resources. See Kelly v. EPA, 203 F.3d 519, 522-23 (7th Cir. 2000) ("permit process is 'the cornerstone of the . . . scheme for cleaning up the nation's waters,'" and defendants who did not apply for a permit "never allowed the process to work") (citations omitted).

If the Defendant is not significantly penalized, the public may incorrectly perceive there are no negative consequences even for flagrant and egregious violations such as these. Moreover, members of the public who also own real estate containing wetlands may be at a competitive disadvantage in the sale or use of their property as a result of their compliance with the law, a result that would be both unfair and undermine CWA enforcement.

The same reasoning applies with respect to Defendant's failure to comply with three cease and desist letters. Donovan, Civ. No. 96-484, slip op. ¶ 13. The Corps issues hundreds of these letters nationwide every year, and depends on them to obtain compliance with the CWA. These administrative tools, however, are not self-enforcing. The Corps must file an action in federal court to enforce the CWA. The Corps and the courts would be enormously burdened if recipients of these letters felt they could be ignored with impunity until a federal

Page 27

lawsuit is filed to compel compliance. <u>United States v. Hartz Constr. Co.</u>, No. 98-C-4785, 2000 WL 1220919, at *2 (N.D. Ill. Aug. 18, 2000) ("to require the EPA to obtain a court order compelling compliance . . . would impose an enormous and unnecessary burden on the agency's efforts to enforce the Clean Water Act, as well as on the courts") (U.S. Exhibit 12).

2.    <u>The Defendant Benefitted Economically From His Violations.</u>

As discussed above, to serve as a deterrence, the penalty must, among other things, completely remove any economic gain a defendant derives from his violations. Otherwise the penalty will be no more than a "cost of doing business," which would result in an economic advantage to violators over those who spend funds to comply in a timely fashion. <u>Gulf Park</u>, 14 F. Supp. 2d at 862-63. Congress explicitly directed courts to recover economic benefit. As the Third Circuit has observed:

> Precise economic benefit to a polluter may be difficult to prove. The Senate Report accompanying the 1987 amendment that added the economic benefit factor to section 309(d) recognized that a reasonable approximation of economic benefit is sufficient to meet plaintiff's burden for this factor.
>
> > Violators should not be able to obtain an economic benefit vis-a-vis their competitors due to their noncompliance with environmental laws. The determination of economic benefit or other factors will not require an elaborate or burdensome evidentiary showing. *Reasonable approximations of economic benefit will suffice.*

S. Rep. No. 50, 99th Cong., 1st Sess. 25 (1985) (emphasis supplied).

<u>Powell Duffryn</u>, 913 F.2d at 80.

Page 28

The Court, however, need not find that a defendant derived an economic benefit from a violation to impose a substantial civil penalty. In <u>Key West Towers</u>, for example, the court did not find any significant economic benefit from the violation and based the penalty upon the seriousness of the violation and lack of good faith efforts to comply with the CWA because the violation occurred after defendant received a cease and desist letter from the Corps. 720 F. Supp. at 965-66.[15]

Moreover, the Defendant derived a significant economic benefit by delaying the expense of restoring the illegally filled wetlands since January 1993. Because the Defendant has had the opportunity to earn a return on those funds for approximately 12.9 years, the Defendant gained a substantial economic benefit compared to a similarly situated person who comes into compliance with the CWA by removing the fill material immediately. <u>See, e.g.,</u> <u>Smithfield Foods</u>, 191 F.3d at 529-30 ("economic benefit is assessed to keep violators from gaining an unfair competitive advantage by violating the law" and "is accomplished by including as part of the penalty an approximation of the amount of money the violator has saved by failing to comply" with the law.).

The United States' expert, Gerry Harris, used a United States Environmental Protection Agency "BEN" computer model to calculate the economic benefit Defendant has enjoyed by delaying restoration spending since January 1993.[16] Harris Affidavit ¶ 6. The

---

[15] In <u>Key West Towers</u>, the Court awarded a $250,000 penalty for illegally filling 2.1 acres of wetlands or $125,000 per acre. At the time <u>Key West Towers</u> was decided in 1989, the maximum penalty was only $10,000 per violation. 720 F. Supp. at 964.

[16] Gerry Harris's qualifications as an expert are set forth in Paragraph 1 and Attachment 1 to his affidavit. Harris Affidavit ¶ 1 and Attachment 1 (U.S. Exhibit 6).

Page 29

model uses standard financial cash flow and net present value analysis techniques to measure the economic benefit from delaying or avoiding the implementation of pollution control measures. Id. It is widely used by EPA and state environmental agencies to assess penalties. Id.

Based upon the fact that (1) the Defendant has delayed restoring the 1.771 acres of wetlands since January 1993 (that is, for 13 years, until January 2006 for ease of calculation), (2) the cost of restoring the wetlands would have been $101,710 in 1993,[17] and (3) the average rate of return for United States Treasury securities was 6.10 percent over the last ten years,[18] Mr. Harris' calculated Defendant's economic benefit from delaying the wetland restoration to be $217,665 Id. ¶¶ 7-13. The requested $256,000 civil penalty properly captures this economic benefit.

Even had Defendant not delayed in restoring the property, he did accrue a significant economic benefit in filling in the 1.771 acres of wetlands. On July 16, 2005, the United States' expert Philip McGinnis appraised the subject property as-is (i.e., with the 1.771 acres of wetlands filled), as having a market value of $85,000. Mr. McGinnis also appraised the subject property as if the wetlands on the property had not been destroyed as worth $4,000.

---

[17] The Corps' Cost Engineering Branch, which prepares cost estimates for civil and military construction projects, estimates that it would have cost the Defendant $101,710 to restore the 1.771 acres of wetlands in 1993. Harris Affidavit ¶ 4 and Attachment 3 (U.S. Exhibit 6); see also Steen Declaration ¶¶ 35-36 and Steen Ex. 10 (U.S. Exhibit 3).

[18] The United States' expert used a more conservative Treasury rate of 6.10 percent to calculate the economic benefit, rather than the more aggressive discount/compound rate of 10.4 percent, based upon the assumption that it more accurately reflects the rate of return this Defendant could have reasonably achieved if he conservatively invested the $101,710. Harris Affidavit ¶ 7.

McGinnis Affidavit ¶¶10-33 (U.S. Exhibit 5). Thus, unless the wetlands are fully restored, Defendant would also enjoy an additional economic benefit of $81,000 as a result of filling and destroying the 1.771 acres of wetland on his property. Harris Affidavit ¶¶ 5, 13 (U.S. Exhibit 6).

As noted above, a civil penalty must do more than capture economic benefit to serve as a deterrent; it must also reflect Defendant's compliance history and good faith efforts to comply, which are discussed below. See Roll Coater, 21 Envtl. L. Rep. at 21075-76 (U.S. U.S. Exhibit 11); ITT Continental Baking, 420 U.S. at 231; Smithfield Foods, 191 F.3d at 530; Powell Duffryn Terminals, Inc., 720 F. Supp. at 1163.

3.    The Defendant Has An Egregious History Of Non-Compliance.

In assessing a defendant's compliance history, courts examine the duration of the violations, whether defendant committed violations in the past, and whether the violations are continuing in nature. See Gulf Park, 14 F. Supp. 2d at 859. As discussed above, Defendant's violations were willful, flagrant, and have continued for more than twelve years. Moreover, Defendant cannot reasonably argue that he was unaware that the CWA applied to his activities because the government attempted to work with him to apply for and obtain an appropriate permit before he committed the violations.

4.    The Defendant Openly Ignored The Clean Water Act.

The Defendant's history of non-compliance is particularly egregious and does not support any reduction in penalty. Defendant had actual knowledge of the CWA's requirements no later than August 1987, when the Corps advised him that the CWA applied to his proposed work in the wetlands and requested that he apply for a permit. Donovan,

Page 31

Civ. No. 96-484, slip op. ¶¶ 5-7 [Dkt. 51]. Despite the warning, Defendant discharged fill material into the wetlands without applying for a permit. In January 1993, the Corps posted a "Notice of Violation" on a bulldozer located on Defendant's property and telephoned him the next day advising him not to do further work until the violation is resolved. Id. ¶ 10. On January 29, 1993, the Corps sent Defendant a written notice informing him that he had violated federal law. Id. ¶ 11. Nevertheless, by February 23, 1993, Defendant had discharged additional fill material into the wetlands. Id. ¶ 12. On July 13, 1993, the Corps ordered Defendant, in writing, to remove the fill material or apply for a permit. Id. ¶ 13. The Corps sent Defendant additional notices on July 25, 1993 and September 8, 1993. Id. Defendant, however, "responded in writing . . . that he would not comply" and filled the wetlands in flagrant violation of the CWA. Id. ¶¶ 8-15.

In addition to ignoring the three cease and desist letters and a notice of violation, Defendant threatened a federal official. In a letter dated September 13, 1993, Defendant wrote to Frank J. Cianfrani, Chief of the Regulatory Branch for the Philadelphia District of the Corps. In that letter the Defendant declared his land a "foreign nation" and himself immune from federal and state law, identified himself as a member of a militia group, and threatened to defend "by whatever means necessary." Letter from David H. Donovan to Mr. Cianfrani, United States Army Corps of Engineers (U.S. Exhibit 1). Defendant has also made no effort to ameliorate the damage he has caused. Such egregious conduct merits a strong response by this Court.

Page 32

5.    The Economic Impact Of The Proposed Penalty.

The Court should reduce the statutory maximum civil based upon the economic impact it would have on the Defendant. As explained above, the Defendant has amassed <u>at least</u> $660,000 in wealth, which he has attempted to hide from the government and creditors over the years using shell companies, including an off-shore company, and a false social security number. He owns a personal residence worth $190,000, an investment property worth $300,000, and more than $170,000 in liquid bank and brokerage accounts as of August 2005. <u>See supra</u> at 8-15. Thus, although the civil penalty would have an economic impact on the Defendant, he should easily be able to pay a $256,000 civil penalty. Given Defendant's known assets, a $256,00 civil penalty should allow him to retain his primary residence, more than $214,000, and his vehicles.

III.    THE COURT SHOULD REJECT DEFENDANT'S ATTEMPT TO RE-LITIGATE, FOR A THIRD TIME, THE ISSUE OF HIS LIABILITY UNDER THE CWA.

On February 16, 2006, Defendant filed two motions, Dkt. 82, 83 and 84, that attempt to re-litigate, for the third time, the issue of his liability under CWA section 404.[19] In a Memorandum and Order dated March 26, 2002, this Court held that "the Government has established by undisputed evidence that it is entitled to judgment on the issue of liability under Section 404 of the Clean Water Act." <u>Donovan</u>, No. 96-484, slip. op. at 8 [Dkt. 51]. The Court reached this conclusion following full briefing on cross-motions for summary judgment on the issue of liability [Dkt. 41, 47-49, 50], and after finding that the United States established by a preponderance of evidence each of the five elements necessary to establish

---

[19] Defendant's last attempt to re-litigate issues of liability was in the fall of 2004 [Dkt. 61, 64].

Defendant's liability. <u>Donovan</u>, No. 96-484, slip. op. at 6-7 [Dkt. 51]. Specifically, the Court found that "Mr. Donovan is a person who discharged a pollutant without authorization" from a point source into waters of the United States. <u>Id.</u> at 7 [Dkt. 51]. Defendant's current motions do not raise any new issues. Accordingly, the Court should reject Defendant's attempt to re-litigate the issue of liability for a third time.

IV.     THE COURT SHOULD REJECT DEFENDANT'S ATTEMPT TO RESURRECT HIS COUNTERCLAIM AGAINST THE UNITED STATES.

On February 16, 2005, Defendant also attempted to resurrect his previously rejected counterclaim against the United States [Dkt. 82, 84]. In the United States' Motion for Summary Judgment under Section 404 of the Clean Water Act dated November 1, 2000 [Dkt. 47], the government demonstrated, among other things, that the Court should grant summary judgment to the United States on Defendant's Counter-Complaint for Declaratory and Injunctive Relief and for Damages Due to Conversion of Personal Property.[20] U.S.' Mot. for Summ. J. at 14-15 [Dkt. 47]. Defendant also filed a cross-motion for summary judgment on his counterclaim. In the Court's Memorandum Opinion and Order dated March 26, 2002, the Court concluded that "Mr. Donovan has not adduced any evidence to support his counterclaim" and denied Defendant's Motion for Summary Judgment. <u>Donovan</u>, No. 96-484, slip. op. at 8 [Dkt. 51]. Likewise, the Court granted the United States' Motion for Summary Judgment, which specifically requested summary judgment in favor of the United States on both Defendant's counterclaim and Defendant's liability for violating the CWA.

---

[20]  In that motion, the government also renewed its prior Motion to Dismiss Defendant's Counter-Complaint for Failure to State a Claim Upon Which Relief Can be Granted and for Lack of Subject Matter Jurisdiction. U.S.' Mot. for Summ. J. at 15 [Dkt. 47].

Accordingly, there is no basis for this Court to consider a new Defendant's demand for damages against the United States.

## CONCLUSION

For the reasons set forth above, this Court should deny Defendant's motions [dkt. 82-84], and grant the United States' Motion for Summary Judgment on Restoration and Civil Penalty. The Court should order Defendant to implement the Wetland Restoration Plan (attached as Exhibit 7 to the Declaration of Jeffrey Steen (U.S. Exhibit 3)) and pay a $256,000 civil penalty.

Respectfully Submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment & Natural Resources Division

By:/s/Steven E. Rusak
Steven E. Rusak, Trial Attorney
Mary Anne Zivnuska, Trial Attorney
Environment & Natural Resources Division
Post Office Box 23986
Washington, DC 20026-3986
Delaware Bar I.D. No. 3144
(202) 514-9275
Steven.Rusak@usdoj.gov

COLM F. CONNOLLY
United States Attorney

By:/s/Patricia C. Hannigan

OF COUNSEL:

BARRY GALE
Office of Counsel
U.S. Army Corps of Engineers
Philadelphia District
Philadelphia, PA 19106

Patricia C. Hannigan
Assistant United States Attorney
Delaware Bar I.D. No. 2145
The Nemours Building
1007 Orange Street, Suite 700
P. O. Box 2046
Wilmington, DE 19899
(302) 573-6277
Patricia.Hannigan@usdoj.gov

Page 35

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DAVID H. DONOVAN,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO. 96-484

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of March, 2006, I caused a true and correct copy of the "United States' Motion for Summary Judgment on Restoration and Civil Penalty," the Memorandum in Support of United States' Motion for Summary Judgment on Restoration and Civil Penalty and in Opposition to Defendant's Motions Filed on February 16, 2006," the Exhibits in Support, and the Proposed Order to be served as indicated below, postage pre-paid, on the following:

Mr. David H. Donovan
517 Massey Church Road
Smyrna, Delaware 19977
Tel: (302) 653-8692

[  ] U.S. Mail
[X] Overnight Mail
[  ] Hand Delivery
[  ] Telefacsimile
[  ] E-mail

*Steven E. Rusak*