**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 96-484-JJF (MPT) |
| | : | |
| v. | : | |
| | : | |
| DAVID H. DONOVAN, | : | |
| | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATION**

This is a civil action by the United States against Davis H. Donovan ("Donovan")
to enforce the Clean Water Act.  The United States moved for summary judgment.
Donovan moved for judgment on the pleadings.  This report and recommendation
addresses these motions.

**Statement of Facts.**[1]

Donovan owns approximately four acres of property bordering U.S. Route 13 in
New Castle County, Delaware.  The Army Corps of Engineers ("Corps") has designated
portions of the Donovan property as wetlands located within the watershed of the
Sawmill Branch.  Streams and accompanying wetlands are appendages of the Sawmill
Branch, Smyrna River and Delaware River estuary.  During the late 1980's and early
1990's, Donovan filled a section of his property, allegedly wetlands, to build a fruit stand.

The United States filed a civil action against Donovan to enforce the Clean Water

---

[1] Throughout this document the analysis in this recommendation has adopted
without attribution language suggested by either side in dispute.  In all instances, the
language in question has become that of the court, based on review of the evidence
and law.  Unless otherwise noted, these facts take as true all allegations of the non-
movant that conflict with those of the movant and resolve all doubts against the movant.

Act ("CWA").  In 2006, this court entered a judgment in favor of the United Stated imposing a $256,000 civil penalty and ordered Donovan to restore 0.771 acres of filled wetlands.  Donovan appealed to the United States Court of Appeals for the Third Circuit.  Without opinion, the Third Circuit remanded the instant matter in light of the Supreme Court's ruling concerning CWA jurisdiction in *Rapanos v. United States*.[2]  The sole issue on remand is whether the part of the Donovan property in question is properly categorized a wetland.

**Relevant Statutory Background.**

The objective of the CWA is "to restore and maintain the chemical, physical and biological integrity of the nation's waters."[3]  Prohibited under the statute *inter alia* is the discharge of any pollutant by any person unless otherwise provided in the Act.[4]  The term "discharge of any pollutant" means any addition of a pollutant to "navigable waters from any point source."[5]  Pollutant is defined broadly under the CWA, including material such as rock, sand, and cellar dirt.[6]

The statutory term "navigable waters" is defined in the CWA as "waters of the United States."[7]  The Corps has construed the term "waters of the United States" to

---

[2] 547 U.S. 715 (2006).

[3] 33 U.S.C. § 1251(a).

[4] 33 U.S.C. § 1311(a).

[5] 33 U.S.C. § 1362(12).

[6] *See* 33 U.S.C. § 1362(6) (specifying pollutants included within Clean Water Act).  "Pollutant is defined as dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."  *Id.*

[7] 33 U.S.C. § 1362(7).

include not only the traditionally navigable waters, but also tributaries of those waters, and wetlands adjacent to those waters or tributaries.[8]  The Supreme Court confirmed adjacent wetlands fall under the "waters of the United States" definition and, therefore, are subject to federal regulation.[9]  Subsequently, the Supreme Court created a distinction between the adjacent wetlands that are within the jurisdiction of the federal government, and wetlands to which the connection to navigable water is too attenuated to fall under CWA jurisdiction.[10]

**Motion for Summary Judgment.**

### Standard of Review for Motion for Summary Judgment.

Summary judgment is appropriate where there is no genuine issue of material fact.[11]  In such a case, the moving party is entitled to judgment as a matter of law.[10]  Although the burden of proof is on the moving party to establish the absence of a genuine issue of material fact, the nonmoving party is not relieved of his duty to introduce evidence capable of supporting a favorable verdict by the fact finder.[11]  The Supreme Court has held there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in their favor.[12]  Factual

---

[8] 33 C.F.R. §§ 328.3(a)(1), (5), (7) (2005).

[9] *See United States v. Riverside Bayview Homes*, 474 U.S. 121 (1985) (holding the inclusion of adjacent wetlands within regulated waters of the United States is a permissible interpretation of statute).

[10] *See Rapanos*, 547 U.S. 715 (differing on test as to whether a wetland is subject to federal regulation).

[11] FED. R. CIV. P. 56(c).

[10] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322--23 (1986).

[11] *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256--57 (1986).

[12] *Id.* at 249.

disputes must be genuine and material to defeat a summary judgment motion. Irrelevant or unnecessary factual disputes fail the materiality requirement and are insufficient to defeat a motion for summary judgment.[13]

**Motion for Summary Judgment Analysis.**

    **I.     Issue.**

The sole issue in this case is whether, under the legal standard set forth in *Rapanos*, the wetlands at issue are "waters of the United States" and protected by the CWA.

    **II.     Rapanos v. United States.**

In *Rapanos*, the Supreme Court addressed how "navigable waters" should be construed under the CWA, and the extent to which the term includes wetlands. All members of the Court agreed that "navigable waters" encompassed something more than navigable-in-fact waters.[14] With no majority opinion, five justices concurred that a remand was necessary to determine whether the wetlands in question were "navigable waters" covered by the Act, and whether the Environmental Protection Agency and Corps impermissibly extended their regulatory jurisdiction under the CWA.

Justice Scalia, writing for the four justice plurality, determined that the establishment of CWA jurisdiction requires two findings: first, the adjacent channel contains a "water of the United States," (*i.e.*, a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a

---

[13] *Id.* at 248.
[14] *Rapanos*, 547 U.S. at 730–31 (plurality opinion); 767 (Kennedy, J., concurring opinion); 788 (Stevens, J., dissenting opinion).

continuous surface connection with that water making it difficult to determine where the water ends and the wetland begins.[15]

In his concurring opinion, Justice Kennedy interpreted the term to cover only those wetlands that possess a significant nexus to waters that are or were navigable-in-fact or that could reasonably be so made.[16]  He explained wetlands possess the requisite nexus and fall within the statutory phrase "navigable waters" when the wetlands, "either alone or in combination with similarly situated wetlands in the region, significantly affect the chemical, physical and biological integrity of other covered waters readily understood as 'navigable.'"[17]  In contrast, when the wetlands' effects on the water quality are "speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'"[18]  Jurisdiction can be met by a showing of adjacency alone; a surface connection is not necessary to meet the "sufficient nexus" test.[19]  Therefore, where there is a sufficient nexus between the wetland and the traditionally navigable water, the wetland falls within CWA jurisdiction; adjacency to a navigable water is one way to satisfy Justice Kennedy's "sufficient nexus" requirement.[20]

---

[15] *Id.* at 742 (summarizing test created by plurality opinion).

[16] *Id.* at 759 (Kennedy, J., concurring in the judgment) (quoting *Solid Waste Agency v. United States Army Corps. of Eng'rs.*, 531 U.S. 159, 167 (2001)).

[17] *Id.* at 780.

[18] *Id.*

[19] *Id.* (providing example of sets of facts likely to meet "sufficient nexus" standard).

[20] *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 1000–01 (9th Cir. 2007) (explaining a hydrological connection alone will affect the integrity of navigable in fact water, therefore this connection satisfies Justice Kennedy's sufficient nexus test).

The dissenting Justices' approach was most deferential to the agencies entrusted by Congress to implement the CWA.[21]  Justice Stevens, whose dissent was joined by three other justices, believed it was clear that wetlands adjacent to tributaries of streams have a sufficient nexus with downstream navigable waters, stating "[t]his logical connection alone" is all the CWA requires."[22]  In recognition of the Court's fragmented opinion, Justice Stevens provided the following instruction in his dissent for the lower courts regarding *Rapanos*:  "Given that all four Justices who have joined [the dissent] would uphold the Corps' jurisdiction . . . in all other cases in which either the plurality's or Justice Kennedy's test is satisfied–on remand each of the judgments should be reinstated if *either* of those tests is met."[23]

### III.    The Controlling Standard.

The rule of law in the *Rapanos* opinion has been the topic of debate on wetland determination since its inception.  In close cases, lower courts have devoted considerable discussion to the rule of law established in *Rapanos*.[24]  Nearly every court who applied *Rapanos* has cited to *Marks v. United States*, as guidance for interpreting the holding of a plurality opinion.  In *Marks*, the Supreme Court instructed, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys

---

[21] *Rapanos*, 547 U.S. at 810 (taking the position that the plurality and concurring opinion fail to appropriately defer to federal agency wetland determination).

[22] *Id.* at 808 (reasoning that Corps' longstanding regulations are not overbroad).

[23] *Id.* at 810 (emphasis in original).

[24] *See United States v. Cundiff*, 555 F.3d 200, 208–11 (6th Cir. 2009) (discussing appropriate standard when applying *Rapanos*); *United States v. Johnson*, 467 F.3d 56 (1st Cir. 2006); *United States v. Robinson*, 505 F.3d 1208 (11th Cir. 2007).

the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."[25] Unfortunately, no single opinion in *Rapanos* is a logical subset of any other opinion.  In fact, the concurring and plurality opinions both flatly reject the other's view.[26]  The Circuits have found *Marks* to be virtually impossible to apply to *Rapanos*.[27]

The United States Court of Appeals for the Third Circuit has not addressed CWA jurisdiction with respect to wetlands since the *Rapanos* opinion.  Of the Circuit Courts that have considered *Rapanos*, Justice Kennedy's test has been the common denominator in nearly all *Rapanos* analyses.[28]  The Eleventh Circuit has determined coverage under the CWA may be established under only Justice Kennedy's standard.[29]

---

[25] *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotation marks omitted).

[26] *See Rapanos*, 547 U.S. at 756 (Scalia, J., plurality opinion) ("Justice Kennedy's test simply rewrites the statute."); *id.* at 778 (Kennedy, J., concurring opinion) ("The plurality reads nonexistent requirements into the Act.").

[27] *See United States v. Bailey*, 571 F.3d 791, 798 (8th Cir. 2009) (explaining that because of the minimal overlap between the plurality's and Justice Kennedy's opinion, determining which holding is the narrowest is difficult, which makes applying the *Marks* rationale problematic); *see also Cundiff*, 555 F.3d at 209 (reasoning that the *Marks* analysis falters where the standard of a concurring opinion is not the logical subset of another opinion).

[28] *See City of Healdsburg*, 496 F.3d at 1000 (stating Justice Kennedy's standard applies in most instances); *Robinson*, 505 F.3d at 1219–22 (holding CWA coverage may be established only under Justice Kennedy's test); *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724–25 (7th Cir. 2006) (applying Justice Kennedy's test to facts before them but not precluding establishment of CWA jurisdiction under plurality standard); *Johnson*, 467 F.3d at 66 (holding jurisdiction is proper under either test); *Bailey*, 571 F.3d at 799 (following *Johnson* court's approach to find jurisdiction under either standard and applying only Justice Kennedy's test); *Cundiff*, 555 F.3d at 210 (stating jurisdiction is proper under both tests).

[29] *Robinson*, 505 F.3d at 1219–22.

The Seventh and Ninth Circuits applied Justice Kennedy's test, but did not foreclose the possibility of establishing CWA jurisdiction under the plurality's standard.[30]  The First, Sixth and Eighth Circuits follow the dissent's instruction that jurisdiction is proper under both Justice Kennedy's or the plurality's tests.[31]

The reasoning of First Circuit Judge Kermit Lipez in *United States v. Johnson* is the most persuasive; his approach has been adopted by the Sixth, and Eighth Circuits.[32] Judge Lipez held the *Marks* rule unworkable as applied to *Rapanos*, and followed the dissent's instruction to confer jurisdiction if either test is met.[33]  Donovan has urged this court to adopt the plurality's test alone.  However, since he has neither cited, nor can there be found, any caselaw adopting the plurality's opinion alone as the controlling test from *Rapanos,* jurisdiction may be established under either the plurality's or Justice Kennedy's test.[34]

## IV.    The Donovan Wetlands are "Waters of the United States."[35]

---

[30] *Bailey*, 571 F.3d at 798 (discussing holdings in *Gerke*, 464 F.3d 723, and *City of Healdsburg*, 496 F.3d 993).

[31] *Johnson*, 467 F.3d at 66 (accepting dissent's guidance); *Cundoff*, 555 F.3d at 208; *Bailey*, 571 F.3d at 799 (following approach in *Johnson*).

[32] *Johnson*, 467 F.3d 56; *Cundiff*, 555 F.3d 200; *Bailey*, 571 F.3d 791.

[33] *Johnson*, 467 F.3d at 66.

[34] *See* D.I. 141 at 16–18, (advocating for adoption of plurality's standard but failing to cite any authority).

[35] Defendant failed to submit any expert testimony to contradict Unites States' expert testimony, thus the United States' experts' statements are unopposed. Defendant urged the court to strike declarations of two United States experts.  Since FED. R. CIV. P. 37(b)(2)(A)(ii) gives the court discretion to strike material, and there is neither evidence of bad faith, nor prejudice or harm to defendant, this court would likely not strike the declarations in question from the record.  The analysis below however, was completed without considering the declarations Donovan opposed.

### A.    The Donovan Wetlands are "Waters of the United States" Under the Plurality's Test.

CWA jurisdiction may be established if (1) the adjacent channel contains a relatively permanent body of water connected to traditional interstate navigable waters, and (2) the wetland has a continuous surface connection with that water making it difficult to determine where the water ends and the wetland begins.[36]

### 1.    Streams on the Donovan Property are Relatively Permanent Bodies of Water Connected to Traditionally Navigable Waters.

The Sawmill Branch is a tributary of the Smyrna River, which drains into the Delaware estuary.  The tidal portion of the Sawmill Branch and the Smyrna River is navigable-in-fact.  Edward M. Lunay, expert for the United States, prepared a report ("Lunay report") of the site conditions and characteristics of the Donovan property and the surrounding Sawmill Branch drainage basin.[37]

After extensive analysis, Lunay determined streams on the Donovan property are perennial streams.  According to his report, "the Donovan wetlands are connected to downstream navigable waters by abutting channels that discharge flow on a perennial basis."[38]  Lunay observed, "such a degree of soil saturation and surface ponding in wetlands during the summer months; morphological conditions of the vegetation such as buttressing of tree trunks and formation of hummocks; the presence and density of

---

[36] *Rapanos*, 547 U.S. at 742.

[37] Edward M. Lunay is a professional wetland scientist with twenty years experience in delineation of coastal and freshwater wetland types throughout the mid-Atlantic states.  *See* D.I. 139, Lunay report, Ex. 13 (professional résumé).

[38] *Id.* at 15–16.

plant species adapted to saturated soil conditions; and the presence of a bed, bank, ordinary watermark and flowing water in the tributary channels . . . are perennial streams."[39]  In his concluding statement, Lunay explained, based on its flow characteristics and physical features, the entire nontidal downstream portion of the main stem of the Sawmill Branch is a perennial stream.[40]

Lunay observed an ordinary high watermark, in-stream aquatic vegetation, and flowing water along the length of the streams extending from the Donovan property to the main stem of the Sawmill Branch.[41]  He noted three, thirty-inch diameter, metal culverts along the same stretch.[42]  These culverts are consistent with the expectation of perennial heavy water flow volume during the wet season and during storm events from upstream areas.[43]

United States submitted an additional report, authored by scientists from the Stroud Water Research Center ("Stroud report").[44]  The Stroud report also suggests the streams on the Donovan property are permanent.  To determine permanence of streams, the Stroud report documented the presence of aquatic biology on the Donovan

---

[39] *Id.* at 18.

[40] *Id.*

[41] *Id.* at 12.

[42] *Id.*

[43] D.I. 139, Lunay report at 12.

[44]  The Stroud report was submitted as "Declarations and Expert Report of Drs. David B. Arscott, Bernard W. Sweeney, and Louis A. Kaplan."  *See* D.I. 139, Stroud report, Kaplan CV, 1–6, Sweeney CV, 1–6, and Arscott CV, 1–10 (detailing credentials/expertise of Kaplan (chemistry, geochemistry, and bio chemistry), Sweeney (aquatic micro invertebrates and fish), and Arscott (geographic information, field logistics, and hydrology)).

property and more generally on the Sawmill Branch.[45]  Stroud scientists found several organisms in the wetlands and channels on the Donovan property, some of which have two year life cycles.[46]  The presence of an organism with a two year life cycle is strong evidence the water has been flowing continuously for at least two years prior to discovering the organism.[47]  Two species of fish were also documented on the Donovan property.[48]  The aquatic biological evidence in the Stroud report corroborate the findings in the Lunay report.  Together, these reports strongly suggest that the streams on the Donovan property are relatively permanent and therefore meet the first prong of the plurality's standard.

## 2. The Wetland has a Continuous Surface Connection With Traditional Navigable Waters.

The plurality in *Rapanos* held that jurisdiction of the CWA extends to wetlands with a continuous surface connection to bodies of water that are "waters of the United States" in their own right, so that there is no clear demarcation between waters and wetlands.[49]  A continuous surface connection exists when a wetland physically abuts another regulated body of water.[50]

To document an unbroken surface water connection with the Donovan property,

---

[45] *Id.* at 10 (explaining research center's approach).

[46] *Id.* at iv, 85, 102 (noting biological findings on Donovan's property and bordering wetlands).

[47] *Id.* (synthesizing results taken from data collected on Donovan's property relating to aquatic macroinvertebrates and fish).

[48] *Id.* at 93 (documenting results of fish analysis).

[49] *Rapanos*, 547 U.S. at 742.

[50] *Id.* at 747–48.

Lunay walked along streams on the Donovan property, and followed them to their confluence with the main stem of the Sawmill Branch.  The main stem of the Sawmill Branch connects to the navigable waters of the Sawmill Branch and the Smyrna River.[51] He documented an unbroken surface water connection between the Smyrna River and the Donovan property through a network of tributary stream channels.[52]  These tributary stream channels abut the Donovan wetlands.[53]  Supplementing his written report are fifty-eight photographs with explanatory captions detailing the water connection from the Donovan property to the Sawmill Branch.[54]

The United States' experts from Stroud Water Research Center conducted a hydrological connectivity test.[55]  Stroud scientists added a tracing chemical to a stream on the Donovan property and measured the tracer's concentration at a second data point nearly 2,700 meters (or +1.6 miles) downstream.[56]  Samples of downstream water were taken every eight hours for 3.6 days.[57]  Tracer concentration in the downstream water was zero milligrams per liter for the first forty hours of the test.[58]  In the sixtieth hour, tracer concentration results spiked to fourteen milligrams per liter, and by hour

---

[51] D.I. 139, Lunay report, Ex. 3 and 4 (mapping connection from Donovan streams to Smyrna River and Delaware estuary).

[52] *Id.* at 3 (explaining that after careful evaluation Lunay determined that streams with perennial flow connect Donovan wetlands to downstream navigable waters).

[53] *Id.*

[54] *Id.*, Ex. 2–5 and 6–9 (documenting surface water connection to Sawmill Branch).

[55] *Id.* at 26.

[56] *Id.* (furnishing parameters of hydrological connectivity test).  The tracer is a bromide solution, a compound naturally absent from the wetland complex.

[57] D.I. 139, Stroud report at 27.

[58] *Id.*

eighty tracer concentration had diminished to two milligrams per liter.[59]  The abrupt

momentary increase in tracer concentration strongly suggests an unbroken surface

water connection running from the Donovan property to the navigable waters

downstream.  The United States has offered sufficient evidence to support a finding of a

surface connection from Donovan's property to downstream navigable waters.

> **B.     The Donovan Wetlands are "Waters of the United
>         States" Under Justice Kennedy's Sufficient Nexus Test.**

Wetlands possess the requisite nexus and fall under the statutory phrase

"navigable waters" when the wetlands, "either alone or in combination with similarly

situated wetlands in the region, significantly affect the chemical, physical and biological

integrity of other covered waters readily understood as 'navigable.'"[60]  The Donovan

property, in combination with similarly situated properties in the region affect the

physical integrity of the downstream waters.[61]  The Eighth Circuit's decision in *United*

*States v. Bailey* is illustrative of evidence which establishes a sufficient nexus to

navigable-in-fact water at the summary judgment stage.[62]  In *Bailey*, the court looked to

the 1987 Corps of Engineers Wetlands Delineation Manual ("1987 manual") and Corps'

guidance interpreting the manual.[63]  In the instant case, Lunay took the same approach.

---

[59] *See Id.*, Figure 20 (representing graphically, results from bromide concentration test).

[60] *Rapanos*, 547 U.S. at 780.

[61] *See infra* notes 63–90 and accompanying text for analysis of wetland determination under Justice Kennedy's standard.

[62] 571 F.3d 791.

[63] *Bailey*, 571 F.3d at 800 (using Corps' guidance to determine whether a wetland is a water of the United States).  On appeal from the district court decision, the appellate court addressed a challenge to the expert report as an insufficient and unreliable

Lunay used the 1987 manual to direct his analysis.[64]  Logically, the data must be collected during acceptable conditions representative of the area's typical water levels.[65]  The investigation began in October 2008 and lasted through September 2009.[66]  The 1987 manual defines land as a wetland when the land (1) is dominated by hydrophytic vegetation, (2) has wetland hydrology, and (3) consists of hydric soils.[67]

The land was found to be dominated by hydrophytic vegetation.[68]  Plant life on the Donovan property requires and is indicative of very wet saturated soil conditions according to the Lunay report.[69]  Nine different species of wetland shrubs and herbaceous groundcover were found on the property.[70]  The final determination

---

wetland indicator.  *Id.* at 803.  Specifically, the plaintiff argued at trial that the presence of certain hydrophytic vegetation is misleading and does not indicate an area should be classified as a wetland.  *Id.*  The lower court rejected the evidentiary challenge.  In affirming the district court's decision, the appellate court concluded that although wetland vegetation is a not an unreliable indicator, it is only one of three criterion the Corps uses to define a wetland.  *Id.*

[64] D.I. 139, Lunay report at 14.  Wetland delineation was performed in accordance with the 1987 Corps of Engineers Wetland Delineation Manual and the Interim Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Atlantic and Gulf Costal plain Region.  *Id.*  The data in the Lunay report was compiled during "normal conditions" as illustrated in the exhibits attached to the report.  *Id.* at 14–15.

[65] *Bailey*, 571 F.3d at 800 (listing 1987 manual's requirements for wetland determination).

[66] D.I. 139, Lunay report at 15.

[67] *Id.* at 14 (outlining wetland determination test as described in 1987 manual).

[68] *Id.* (explaining wetland indicator status of plant species was confirmed using the 1988 National List of Plant Species that Occur in Wetlands:  Northeast (Region 1)).

[69] *See* D.I. 139, Lunay report at 18 (listing wetland vegetation dominating Donovan property).  "Of particular note is the abundant presence of skunk cabbage within saturated wetland areas and along tributary stream, channels . . . it requires and is indicative of very wet saturated soil conditions."  Lunay report at 14.

[70] *Id.* at 14.

regarding the hydrophytic vegetation analysis was that the vegetation parameter for wetlands is met by the forest community.[71]

The land has wetland hydrology.  The hydrological parameter was evaluated using primary and secondary indicators as well as local regional water table observation well data.[72]  Primary indicators include inundated soils, saturated soils in the upper twelve inches, water marks, drift lines, sediment deposits, and drainage patterns in wetlands.[73]  If primary indicators are absent, then two secondary indicators are required for wetland delineation.[74]  Secondary indicators include oxidized root channels, water-stained leaves, local soil survey data, a FAC–neutral test, and the possibility of an additional unnamed indicator.[75]

Data was collected and subsequently recorded on the wetland delineation manual sheets in Lunay's report.  The data plots are not located on the Donovan property.[76]  Data that conclusively proves the bordering property is a wetland is probative of, but not conclusive of Donovan's property deserving a wetland designation. Nonetheless, the primary/secondary wetland indicator requirements are satisfied.  The Lunay report contains observations on the property such as an ordinary watermark,

---

[71] *Id.*

[72] *Id.*

[73] *Id.*, Ex. 10 (providing criteria for wetland determination within Corps parameters).

[74] *See Bailey*, 571 F.3d at 801 (explaining that although no samples were taken to determine primary indicators, two secondary indicators, if met, will support a finding of wetland hydrology).

[75] D.I. 139, Lunay report, Ex. 10 (listing codified secondary hydrology indicators).

[76] *Id.* at 17 (explaining data was taken from neighboring property that, in opinion of expert, most resembles Donovan property).

flowing water in a tributary stream channel and wetland vegetation.[77]  Taken together these factors satisfy the Corps' wetland hydrology requirement.

In addition to the Lunay report's findings regarding wetland hydrology, the Stroud report addressed the Donovan property's hydrological connection, the second prong of the 1987 manual's test, to the downstream navigable waters.[78]  The Stroud report defines "hydrological connection" as the contribution of water from the wetland to the downstream discharge.[79]  In the same test discussed above, Stroud scientists added a hydrologic tracer chemical to the Donovan property to examine downstream physical connections.[80]  The Stroud scientists' test demonstrated a hydrological connection between the entry point on the Donovan property where the tracer chemical was added, and the second data point, located 2,700 meters downstream.[81]  Tracer concentration increased at the second data point.[82]  The recovery of the downstream tracer solution was twenty-seven percent of the original solution added on the Donovan property indicating a strong connection to the downstream waters.[83]

The land also has hydric soils.  The United States Department of Agriculture defines hydric soil as those that are sufficiently wet in the upper part to develop

---

[77] *Id.* at 18 (listing indicators in concluding with his findings and further stating that there are perennial streams on the Donovan property).

[78] *See supra* note 44 (providing Stroud scientists' credentials).

[79] D.I. 139, Stroud report at iv.

[80] *Id.* at 1.

[81] *Id.* at 27.

[82] *Id.*, Figure 20 (representing graphically, results from bromide concentration test).  *See also supra* notes 55–59 and accompanying text for further explanation of hydrological connectivity test.

[83] *Id.*

anaerobic conditions during the growing season.[84]   Anaerobic soil is soil that is devoid of

molecular oxygen.[85]   The term anaerobic is absent from the Lunay report.   However, the

report concluded that the soil has perennial streams.   Specifically, finding the soil

saturated, surface ponding observations, wetland plant vegetation and other indicators

resulted in a determination that the channels located on the Donovan property are

perennial streams.[86]   Perennial streams would logically render the soil beneath the

streams anaerobic.   The Lunay report's final conclusion was that the lands on the

Donovan property are in fact wetlands.[87]

Courts have also accepted evidence showing wetlands perform significant

ecological functions in relation to downstream navigable waters to prove CWA

jurisdiction.[88]   The Lunay report found the wetlands on the Donovan property are

important to the physical, chemical and biological integrity of the downstream navigable

water.[89]   The significant functions noted were the groundwater discharge, pathogen

removal, nutrient removal/retention/transformation, production export and wildlife

---

[84] *See* United States Department of Agriculture, Natural Resources Conservation Service, Hydric Soils Overview, http://soils.usda.gov/use/hydric/overview.html (last visited July 23, 2010) (presenting most current information about hydric soils).

[85] *See* United States Department of Agriculture, Natural Resources Conservation Service, Glossary, http://soils.usda.gov/use/hydric/criteria.html (last visited July 23, 2010) (defining relevant terms related to hydric soils).

[86] D.I. 139, Lunay report at 18.

[87] *Id.* at 24 (specifying lands in question are wetlands, and summarizing the wetlands overall importance to the watershed).

[88] *See Cundiff*, 555 F.3d at 211 (crediting government's expert testimony that wetlands affect ecological functions of downstream waters).

[89] D.I. 139, Lunay report at 25 (concluding Donovan wetlands are important to watershed ecosystem).

habitat.[90]   The United States has adequately shown a connection to the downstream

navigable waters.[91]

**Motion for Judgment on the Pleadings.**

Donovan moves for judgment on the pleadings.  A motion for judgment on the

pleadings, based on the argument that the plaintiff failed to allege a cause of action, is

analyzed under the same standard as a FED. R. CIV. P. 12(b)(6) motion to dismiss for

failure to state a claim for which relief can be granted.[94]   Under Rule 12(b)(6), a court

must take as true all factual allegations in the complaint, and draw all reasonable

inferences in favor of the non-moving party.[95]   In the Third Circuit, a plaintiff must make

a showing of entitlement to relief that surpasses a blanket assertion, or bare averment

of entitlement.[96]   The plaintiff must plead enough facts to state a claim for relief that is

plausible on its face.[97]   A claim is facially plausible when the complaint contains factual

---

[90] *Id.* (providing synopses of Donovan wetlands contribution to downstream navigable waters).

[91] In addition to meeting the standards of the 1987 manual and Lunay's conclusions on the Donovan property's contribution to the Sawmill River Branch Ecosystem, the Stroud analysis of the chemical and biological connections to the Sawmill Branch was extensive.  The Stroud report's analysis of those connections, alone, is sufficient to support a finding that Donovan wetlands fall under CWA jurisdiction.  *See* D.I. 139, Stroud report at 29, 40, 47 (summarizing chemical connection analysis of Donovan wetlands chemical survey methods, toxic chemical sequestration, and chemical processes); *Id.*, at 61, 71, 94 (providing biological connection results from stream metabolism, aquatic macroinvertebrates, and fish).

[94] *Turbe v. Gov't of the Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991) ("Rule 12(h)(2) provides that a defense of failure to state a claim upon which relief can be granted may also be made by a motion for judgment on the pleadings.")

[95] *Gross v. German Found. Indus. Initiative*, 549 F.3d 605 (3d Cir. 2008).

[96] *Phillips v. County of Allegheny*, 515 F.3d 224, 230–35 (3d Cir. 2008).

[97] *Id.*

content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct.[98]

Donovan's argument is that the United States failed to properly allege jurisdiction because the complaint stated the wetlands are adjacent to tributaries of navigable waters.[99]  He claims that CWA jurisdiction only extends to wetlands adjacent to navigable waters, not wetlands adjacent to tributaries of navigable waters.[100]  Donovan argues further the only rule of law that can be taken from *Rapanos* is that 33 C.F.R. § 328.3(a)(7), the jurisdictional claim relied upon by the United States in this case, is invalid.[101]  He believes the controlling standard for wetland determination comes from previous case law.[102]  This argument is incorrect.  *Rapanos* determined that 33 C.F.R. § 328.3(a)(7) is invalid insofar as it granted jurisdiction over all wetlands adjacent to tributaries:  *Rapanos* narrowed the scope of the regulation to include the wetlands that pass either the test proposed by the plurality or Justice Kennedy, instead of all wetlands.  As explained above, wetland jurisdiction can be established under the plurality's or Justice Kennedy's test.

The United States has to affirmatively prove CWA jurisdiction.  It is dependant on how the complaint characterized the property at issue.  In the instant matter, the United States has pled enough facts to state a claim that is plausible on its face.  Had the

---

[98] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (applying plausibility standard provided in *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007)).
[99] D.I. 138 at 15.
[100] *Id.* at 4.
[101] *Id.* at 8.
[102] *Id.*

complaint read "adjacent to navigable waters," as Donovan claims it should have read, the United States would still have to prove the Donovan wetlands are "waters of the United States" under either *Rapanos* standard.  The language suggested by Donovan is no clearer than what the United States pled.  The purpose of fact pleading in a complaint is to give the defendant fair notice of the plaintiff's claim, and the grounds upon which it rests.[103]  Here, the United States has done so.  The assertion that the wetlands at issue fall under the jurisdiction of the CWA is sufficiently clear.  Additionally, the United States proved the Donovan wetlands are within CWA jurisdiction under both *Rapanos* tests.[104]

**Conclusion.**

Under both the plurality and concurring standards set forth in *Rapanos*, the United States has offered sufficient evidence to support a finding that the Donovan wetlands are "waters of the United States," and therefore fall within the jurisdiction of the CWA.  Donovan failed to provide any expert testimony to contradict the government's experts.  Wetland determination, specifically, whether or not there is a nexus between the downstream navigable waters and the wetlands in question requires expert testimony.[105]  The only contrary evidence offered by the plaintiff was lay testimony of Donovan, himself, regarding his observations of the surface of the property.  The United

---

[103] *See* FED. R. CIV. P. 8(a) (requiring only a short and plain statement of the claim and plaintiff's entitlement for relief).

[104] *See supra* notes 35–92 and accompanying text for analysis of wetland jurisdiction under both *Rapanos* tests.

[105] *See Bailey*, 571 F.3d at 802 (rejecting testimony regarding wetland determination because only witness was not an expert).

States submitted competent evidence to show that the Donovan property is a wetlands under both the plurality's surface connection test, and Justice Kennedy's sufficient nexus test.  Donovan has failed to come forward with any contrary evidence sufficient to create a genuine issue of material fact.  This court should grant the United States' motion for summary judgment.

The United States pled enough facts in their complaint to withstand a motion for judgment on the pleadings.  The challenge for failure to properly allege jurisdiction fails, and additionally the United States proved jurisdiction through extensive evidence.

**ORDER AND RECOMMENDED DISPOSITION**

For the reasons contained herein, I recommend that:

1. The United States motion for summary judgment (D.I. 134) be granted.

2. Donovan's motion for judgment on the pleadings (D.I. 137) be denied.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D.Del.LR 72.1.  The parties may serve and file specific written objections within ten (10) days after being served with a copy of this Report and Recommendation.  Fed. R. Civ. P. 72(b).

The parties are directed to the Court's standing Order in Non-Pro Se matters for Objections Filed under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available on the Court's website, www.ded.uscourts.gov.


Dated:  July 23, 2010                    /s/ Mary Pat Thynge_____
                                         UNITED STATES MAGISTRATE JUDGE